UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| MICHAEL SAVILLE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | 10th Circuit No. 05-4058 |
| | ) | |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

On Appeal from the United States District Court
for the District of Utah

The Honorable Dee Benson
United States District Judge
District Court Civil Action No. 2:00CV00681DB

**APPELLEE'S ANSWER BRIEF**

**ORAL ARGUMENT
NOT REQUESTED**

HOLME ROBERTS & OWEN LLP
Martin D. Litt, #23716
Sven C. Collins, #27040
1700 Lincoln Street, Suite 4100
Denver, Colorado  80203-4541
Telephone:  (303) 861-7000
Martin.Litt@hro.com

Attorneys for Defendant-Appellee
International Business Machines
Corporation

**Attachments Included Only in Writing and
Not in Digital or Scanned PDF Format**

#1108762 v1

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1, defendant-appellee, International Business Machines Corporation ("IBM"), states that it does not have a parent corporation, and there is no publicly held corporation that owns ten percent (10%) or more of its stock.

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES...............................................................v

RELATED APPEALS ...............................................................viii

I.    ISSUE PRESENTED FOR REVIEW .....................................1

II.   STATEMENT OF THE CASE.................................................3

III.  RELEVANT FACTS ..........................................................5

     A.    Saville's job with IBM required strong mentoring, teamwork, and customer service skills..........................................5

     B.    Saville's job performance, particularly in the area of customer and peer relations, declined and his attitude became increasingly negative during his final years with IBM prior to retirement. .........7

           Starting in 1995, managers noted problems with Saville's interactions with peers and customers...........................................7

           Saville's performance problems continued and his attitude became worse during his final 10 months of work.......................11

     C.    Ms. Fullmer gave Saville an interim PBC lowering his performance rating in an effort to improve his performance.........12

     D.    Saville complained about his interim PBC to Human Resources and to Ms. Fullmer's supervisor, Brian Myers.............................13

     E.    Having seen continued problems with Saville's performance, Ms. Fullmer decided to give him a choice to go on an improvement plan or separate from the company with severance. 16

     F.    Saville opts to retire and file a lawsuit against IBM instead of continuing his employment on a performance improvement plan...........................................................18

#1108762 v1

G.    Although Saville informed Ms. Pye and Mr. Myers that his peers were grumbling about working but not recording overtime, he never complained that IBM was violating the overtime laws to anyone, and he never even voiced such concerns to the decision maker, Ms. Fullmer, who took action based solely on Saville's unacceptable performance. ............................................ 22

IV.    ARGUMENT ...................................................................................... 25

A.    SUMMARY OF ARGUMENT .................................................. 25

B.    AS THE DISTRICT COURT CORRECTLY RULED, SAVILLE FAILED TO PROFFER FACTS ESTABLISHING A GENUINE DISPUTE OF MATERIAL FACT AS TO EACH ELEMENT OF HIS CLAIM FOR FLSA RETALIATION .......... 29

1.    The District Court Correctly Found No Evidence Of Adverse Employment Action As Saville Presented No Valid Justification Why He Did Not Take The Reasonable Option Continuing His Employment And Trying To Succeed Under The Performance Improvement Plan Rather Than Retiring. ......................................................... 30

2.    Saville Failed To Introduce Any Evidence Raising A Genuine Dispute Of Fact That The Decision Maker, Ms. Fullmer, Knew Of His Complaints About Alleged Illegal Overtime Practices Or Otherwise Show A Causal Connection Between His Complaints And Any Alleged Adverse Employment Action. ............................................ 38

3.    Saville Failed To Show Protected Activity; Neither His Resistance To Ms. Fullmer's Lawful Directives To Reduce Overtime Nor His Notification That Coworkers Allegedly Were Grumbling About Working, But Not Recording, Overtime Constitutes Protected Activity. ......... 43

4.    Even If He Had Evidence To Make Out A Prima Facie Case, Saville's Retaliation Claim Fails As A Matter Of Law Because He Proffered No Evidence Showing That IBM's Reasons For Placing Him On A Performance Improvement Plan Were Pretextual. ................................... 48

V.    CONCLUSION.......................................................................... 56

ATTACHMENTS ........................................................................... 57

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ............................... 58

#1108762 v1

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Agnew v. BASF Corp.*, 286 F.3d 307 (6th Cir. 2002)....................................32, 33, 35, 37

*Anderson v. Stauffer Chemical Co.*, 965 F.2d 397 (7th Cir. 1992)................................51

*Aquilino v. Univ. of Kan.*, 83 F. Supp. 2d 1248  (D. Kan. 2000)....................................53

*Baer v. Scotts Co.*, 2001 Ohio App. LEXIS 5372 (Ohio Ct. App. Dec. 6, 2001)..........34

*Beams v. Norton*, 256 F. Supp. 2d 1203 (D. Kan. 2003), *aff'd* 2004 U.S. App. LEXIS 5728 (2004) ..........................................................................................................56

*Bullington v. United Air Lines*, 186 F.3d 1301 (10th Cir. 1999) .....................................50

*Caslin v. General Electric Co.*, 696 F.2d 45 (6th Cir. 1982) .............................33, 35, 36

*Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390 (10th Cir. 1997)....................29, 48, 49

*Crumpacker v. Kansas Dep't of Human Resources*, 338 F.3d 1163 (10th Cir. 2003) ........................................................................................................................43

*Downes v. Beach*, 587 F.2d 469 (10th Cir. 1978)...........................................................24

*Exum v. U.S. Olympic Committee*, 389 F.3d 1130 (10th Cir. 2004)...............................31

*Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419 (10th Cir. 1993)................................55

*Ford Motor Co. v. EEOC*, 458 U.S. 219 (1982)..............................................................21

*Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413 (9th Cir. 1981).....................47

*Gaines-Tabb v. ICI Explosives, USA*, 160 F.3d 613 (10th Cir. 1998) ...........................50

*Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536 (11th Cir. 1987).................................38

*Guevara v. Best Western Stevens Inn, Inc.*, 2003 U.S. App. LEXIS 21615 (10th Cir. October 22, 2003)..........................................................................................42

*Gust v. Jones*, 162 F.3d 587 (10th Cir. 1998).............................................................9, 17

#1108762 v1

*Hardie v. Cotter & Co.*, 849 F.2d 1097 (8th Cir. 1988)....................................................55

*Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076 (10th Cir. 1999)...........................50

*Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847 (10th Cir. 2000)................................14

*Hillman v. Safeco Ins. Co. of America*, 190 F. Supp. 2d 1029 (N.D. Ohio 2002),
   *aff'd*, 2003 U.S. App. LEXIS 8703 (6th Cir. May 6, 2003) ..........................31, 32, 35

*Jacklovich v. Simmons*, 392 F.3d 420 (10th Cir. 2004) ...................................................49

*Jones v. Denver Post Corp.*, 203 F.3d 748 (10th Cir. 2000) ...........................................53

*Kelley v. Airborne Freight Corp.*, 140 F.3d 335 (1st Cir. 1998) ....................................56

*Leonard v. Gates Rubber Co.*, 2001 U.S. Dist. LEXIS 21377 (W.D. Ky. 2001) .........36

*McCullough v. St. Francis Hospital & Medical Center, Inc.*, 1987 U.S. Dist.
   LEXIS 8695 (D. Kan. Sept. 22, 1987) ...........................................................................33

*McKenzie v. Renberg's Inc.*, 94 F.3d 1478 (10th Cir. 1996)...........................................46

*Peecook v. Northwestern Nat'l Ins. Group*, 1998 U.S. App. LEXIS 18265 (6th
   Cir. Aug. 3, 1998) ..............................................................................32, 35, 36

*Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182 (10th Cir. 2002)...........................39, 46

*Ramsey v. City & County of Denver*, 907 F.2d 1004 (10th Cir. 1990) .........................30

*Reich v. Stewart*, 121 F.3d 400 (8th Cir. 1997)...............................................................47

*Rice v. United States*, 166 F.3d 1088 (10th Cir. 1999)..............................................39, 43

*Ring v. Sears, Roebuck & Co.*, 250 F. Supp. 2d 1130 (D. Minn. 2003) ........................42

*Robertson v. Board of County Comm'rs*, 78 F. Supp. 2d 1142 (D. Colo. 1999)...........47

*Salguero v. City of Clovis*, 366 F.3d 1168 (10th Cir. 2004)...........................................55

*Seely v. Runyon*, 1998 U.S. App. Lexis 31311  (10th Cir. 1998) .............................33, 36

*Shoels v. Klebold*, 375 F.3d 1054 (10th Cir. 2004) .....................................................37, 52

#1108762 v1

*Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204 (10th Cir. 1999) .......................................53

*Stover v. Martinez*, 382 F.3d 1064 (10th Cir. 2004)............................................50, 51, 52

*Tran v. Trustees of the State Colleges in Colo.*, 355 F.3d 1263
   (10th Cir. 2004).....................................................................................30, 34, 51

*Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712 (2d Cir. 1994) ..................................52

*Whitaker v. Pacific Enterprises Oil Co.*, No. 91-5093, 1992 U.S. App. LEXIS
   5135 (10th Cir. 1992) ...........................................................................................47

*Williams v. Rice*, 983 F.2d 177 (10th Cir. 1993)..............................................................39

*Woodward v. City of Worland*, 977 F.2d 1392 (10th Cir. 1992), *cert. denied*,
   509 U.S. 923 (1993)......................................................................................30, 38

## Statutes

Fair Labor Standards Act, 29 U.S.C. § 215 .................................................................. 1, 43

## Rules

10th Cir. R. 28.2(C)(1) ....................................................................................................vii
Fed. R. App. P. 26.1............................................................................................................i
Fed. R. Evid. 801...............................................................................................................9

#1108762 v1

## <u>RELATED APPEALS</u>

Pursuant to 10th Cir. R. 28.2(C)(1), IBM states that the following case is related:  *Saville v. International Business Machines*, United States District Court for the District of Utah, Case No. 2:02CV598TC, Hon. Tena Campbell, appealed as Tenth Circuit Case No. 03-4172.  On March 29, 2005, the Tenth Circuit entered an Order and Judgment dismissing Saville's related appeal with prejudice on the basis of *res judicata*.  *See* **Aplee. Supp. App. at 324-327**.

#1108762 v1

# I.     ISSUE PRESENTED FOR REVIEW

Michael Saville's sole claim for relief against IBM was for retaliation under the Fair Labor Standards Act, 29 U.S.C. § 215 ("FLSA").  The district court ruled that Saville had failed to raise a genuine dispute of material fact on all three elements of his *prima facie* case of FLSA retaliation and on the element of pretext.  Thus, in order for Saville to win reversal of the judgment below, this Court must reverse the district court's rulings on all four of the issues.  In contrast, if this Court affirms the district court's ruling on but one of the issues raised by Saville in this appeal, summary judgment must be affirmed.

IBM agrees with Saville that the operative issues in this appeal are whether the district court properly ruled that Saville had failed to present evidence necessary to raise a genuine dispute of fact as to each element of his *prima facie* case and to the element of pretext.  IBM, however, disagrees with the manner in which Saville has framed some of the issues, as he has employed the incorrect legal standard.  Such issues are:

> 2.b.  "Did the District Court err in finding that Mr. Saville's evidence did not raise a genuine issue of material fact that he articulated a good faith belief that IBM was violating his rights (or those of his coworkers) under the FLSA?"  The operative legal standard is not

1

simply whether Saville "articulated" a belief, but whether he asserted rights adverse to IBM.  *See* Section IV.B.3, p. 46, *infra*.

5.a.   "Did the District Court err in finding that the record was devoid of any evidence that Vickie Fullmer's reasons for the decision to place Mr. Saville on a performance improvement plan were based on anything other than his alleged problems in interacting positively with management, customers and peers?"  The operative legal standard is not whether there is evidence that Ms. Fullmer's decision might be based on "anything other than" IBM's legitimate non-retaliatory reasons (*i.e.*, Saville's problems in interacting positively with management, customers and peers), but whether there is evidence of pretext (*i.e.*, some evidence to indicate that the reasons proffered by IBM are so weak, implausible, inconsistent, incoherent, or contradictory as to support a reasonable inference that IBM did not act for those reasons).  *See* Section IV.B.4.b, p. 50, *infra*.

## II.    <u>STATEMENT OF THE CASE</u>

Saville worked for IBM as a senior customer engineer, a job which required him to maintain positive relations both with the customers to whose accounts he was assigned and with his less experienced peers whom he was to mentor and train.  Faced with repeated complaints from Saville's peers that they did not feel comfortable approaching him for advice or training and from customers who were alienated due to his rude and adversarial communications style, and having already counseled Saville that his performance was unacceptable in these key areas, Saville's manager, Vickie Fullmer, decided to place him on a performance improvement plan.  Rather than accepting ownership for his performance problems and taking the opportunity offered by Ms. Fullmer to continue his employment and remedy those problems, Saville opted instead to retire from IBM in October 1998 and to file a lawsuit.

In his lawsuit, Saville asserted one claim for relief against IBM for retaliation in violation of the FLSA.  Saville claims that IBM forced him to retire in retaliation for complaints he made about alleged overtime violations.

Following the close of discovery, IBM moved for summary judgment in its favor on Saville's sole claim for FLSA retaliation.  **Aplt. App. at 49-50**. IBM contended that Saville lacked sufficient evidence to support any of the elements of his retaliation claim.  ***Id.***

3

Following full briefing and oral argument on IBM's motion for summary judgment, *see* **Aplt. App. at 220**, the district court ruled in IBM's favor. It held that Saville could not make a *prima facie* case because there were not genuine disputed issues of fact showing adverse employment action, protected activity, or a causal connection between any alleged adverse employment action and his alleged protected activity. ***Id.* at 347-362**. Significantly, Saville's attempt to establish adverse employment action by claiming that he was constructively discharged failed because the undisputed facts show that he had the option of remaining employed, but chose, instead, to retire, for his own reasons, and not because of intolerable working conditions. ***Id.* at 358**. The district court also held that Saville failed to proffer evidence raising a genuine dispute of fact as to pretext necessary to overcome IBM's legitimate non-retaliatory reasons for its decision to place him on a performance improvement plan. ***Id.* at 14-15**. Accordingly, the district court granted IBM's motion for summary judgment and entered judgment dismissing Saville's sole claim for FLSA retaliation with prejudice. **Aplee. Supp. App. at 328-331**.[1]

---

[1] IBM has filed Appellee's Supplemental Appendix containing certain papers omitted from Appellant's Appendix. These include the parties' summary judgment briefs (which show the evidence, issues and arguments that the parties presented to the district court), several omitted pages of the transcript of the summary judgment oral argument, and the district court's judgment of dismissal with prejudice. The Supplemental Appendix also includes all of the summary judgment exhibits submitted by IBM. IBM included all of its exhibits, even though some are also contained in

Thereafter, Saville timely filed this appeal. Because the district court ruled against Saville on each of the four necessary elements of his claim for FLSA retaliation, he must convince this Court that the district court's ruling was erroneous as to each issue in order to win reversal on appeal. If this Court affirms on but one of the issues, by contrast, the district court's judgment of dismissal must be affirmed.

### III.   RELEVANT FACTS

**A.    Saville's job with IBM required strong mentoring, teamwork, and customer service skills.**

1.    Saville was employed with IBM from 1966 until his retirement on October 30, 1998. **Aplt. App. at 54** [10:7-11] & **129** [631:22-632:8]. From 1996 through 1998, he was a Customer Engineer ("CE"). *Id.* **at 11** [¶ 10]. Saville was the second highest level CE and the most senior in his group. *Id.* **at 139** [¶ 3].

2.    As a CE, Saville was responsible for maintaining IBM equipment at customer locations, serving as a technical resource for customers, managing customer accounts in a cost-efficient manner, and influencing customers to purchase additional IBM products and services. **Aplt. App. at 85-86** [366:18 –

---

Appellant's Appendix, for the Court's convenience, because such documents are not specifically designated in Appellant's Appendix and are, thus, difficult to locate therein.

#1108762 v1

367:8, 368:13-18], **139-140 [¶ 4] & 275-277**.  There were three general

functions to Saville's job.  First, there was the technical function of being able to

install and maintain IBM equipment for customers.  Saville had the skills and

technological knowledge necessary for the job.  **Aplt. App. at 139-140 [¶ 4]**.[2]

     3.     The second key aspect of the CE job was "developing positive

relationships with customer management and staff to ensure a high level of

overall customer satisfaction in all assigned accounts."  **Aplt. App. at 140 [¶ 5];**

**Aplee. Supp. App. at 163**.

     4.     The third key part of Saville's senior-level CE position was

mentoring and training the less experienced CEs in the group.  **Aplt. App. at 56**

[83:23 – 84:10] **& 140 [¶ 6]**.  It was important that he develop and maintain

good working relationships with his peers so that they would feel comfortable

coming to him to draw upon his valuable knowledge and skills.  ***Id.***

     5.     Good interpersonal skills, for customer and peer relations, were

essential to Saville's job performance.  **Aplt. App. at 140 [¶ 7]**.  Saville was to

"establish and maintain positive work relationships with peers, management,

and customers[,] displaying willingness to understand diverse points of view."

***Id.***; **Aplee. Supp. App. at 165**.  Furthermore, he was required to manage his

---

     [2] Saville contends that his "technical knowledge and skills" were "second to none."  Opening Brief at 6 ¶ 4.  This is neither relevant nor supported by the record.

customer accounts in a cost-efficient manner, which included managing his time and expenses efficiently.  **Aplt. App. at 64** [177:24-178:8, 180:2-5] & **141** [¶ 8].

**B.**  **Saville's job performance, particularly in the area of customer and peer relations, declined and his attitude became increasingly negative during his final years with IBM prior to retirement.**

> ***Starting in 1995, managers noted problems with Saville's interactions with peers and customers.***

6.    Saville contends that he "established a reputation in the community as an excellent IBM employee."  **Opening Brief at 7 ¶ 4**.  This statement both lacks support in the record and was not raised below.  Moreover, as early as 1995, Saville's managers began to note problems with the manner in which he interacted with others.  In Saville's annual performance review (known as a "Personal Business Commitment" or "PBC") for 1995, his manager at the time stated:

> [M]ore is expected in his relationships and the way he communicates with others.  This has lead [sic] some people to not want to use him in his specialist capacity or as a peer.  Mike at times comes across negative and adversarial causing some people to not want to deal with him.

**Aplt. App. at 57** [99:21 – 100:25]; **Aplee. Supp. App. at 171** [Dep. Ex. 3].

Saville received the lowest of three possible ratings, "More is expected."  ***Id.***

7.    Saville's problems in mentoring and relating to his peers continued in 1996, as reflected in his 1996 PBC:

> Mike . . . has a hard time to mentor others because a lot of them prefers [sic] not to work with him. . . .  Mike should continue to work on his relationships with his peers.

**Aplee. Supp. App. at 179** [Dep. Ex. 4]; **Aplt. App. at 58** [103:17 – 104:3].

Saville admitted, in relation to the 1996 PBC, that there were two individuals in his work group who had chosen not to work with him.  **Aplt. App. at 60** [116:6-14].  Indeed, Saville admits that he "was not a perfect employee" and he received performance evaluations where managers "encouraged him to work on his relationships with his peers."  **Opening Brief at 8 ¶ 10**.

   8. Vickie Fullmer supervised Saville from January 1997 through the approximate year and a half prior to his retirement.  **Aplt. App. at 139** [¶ 2].  When she took over as Saville's supervisor, Ms. Fullmer had the impression that Saville had a history of problems with his interpersonal relations.  *Id.* **at 141** [¶ 9]; *see also* **Opening Brief at 8-9 ¶ 11**.  Nonetheless, she gave him a clean slate, hoping that he would correct these problems.  **Aplt. App. at 141** [¶ 9].  During his first year under Ms. Fullmer's supervision, Saville performed well technically, but several of his co-workers complained to Ms. Fullmer that they were uncomfortable asking him for technical assistance because he would often

8

handle the situation in a demoralizing manner and he would talk down to them. *Id.* [¶ 10].[3]

9.    Ms. Fullmer met with Saville and told him that his peers' perception was that he was not easily approachable.  She explained that, as his job required him to be a resource and a mentor, he would need to improve this aspect of his performance.  **Aplt. App. at 141** [¶ 10].  For example, in a November 1997 e-mail to him she stated:

> Mike, you are a very talented SSR.  Don't loose [sic] sight of that. <u>We need to keep working on your interactions with others and the perception that has been created over the years</u>.  I continue to support you and take your name forward in a very positive light....

**Aplee. Supp. App. at 181** [Dep. Ex. 7] (emphasis added).

10.    As part of its annual PBC (performance review) process, IBM solicited comments from each employee's peers.  **Aplt. App. at 87** [385:18-21] & **141** [¶ 11].  This was known as "360 Degree Feedback."  *Id.*  In the 360 Degree Feedback evaluation of Saville's 1997 performance, his peers made the

---

[3] In attempting to create a dispute of fact in opposition to summary judgment, Saville contended that Ms. Fullmer's testimony that other CEs had told her that Saville had difficulties interacting with his peers lacked foundation and was based on hearsay. *See* **Aplee. Supp. App. at 37-38 ¶¶ 10-11**.  Ms. Fullmer's testimony about these complaints is properly based on her perception. *See, e.g., Gust v. Jones*, 162 F.3d 587, 595 (10th Cir. 1998) ("Rule 701 allows a lay witness to give an opinion that is rationally based on his own perception if that opinion is helpful to a clear understanding of a fact at issue.").  Moreover, the complaints are not hearsay because they were introduced to show that they were made and to show Ms. Fullmer's state of mind, rather than for the truth of the matter asserted.  Fed. R. Evid. 801.

following comments reflecting Saville's poor relations with them and with

customers:

- I know Mike is trying harder to have better "bedside manners" and I think he will accomplish the task.  His customer relations is [sic] sometimes strained because of what he says.  Mike has this problem with his peers too. . . .

- A possible point for improvement might be for Mike to be a little less forceful when working with customers when he tries to have them understand his approach with certain projects . . . .

- Mike works to [sic] many hours and it makes him grouchy.

**Aplee. Supp. App. at 182-183**; **Aplt. App. at 141** [¶ 11].  As it turned out,

Saville continued to have challenges interacting with customers.  *See* Section

III.B, p. 11 ¶ 13, *infra*.

11.    Even though Saville needed further improvement in his team

building, customer relations, mentoring and interpersonal skills, Ms. Fullmer

rated him as having "Achieved Commitments" on his 1997 PBC, because she

had seen some improvement in these areas and he had valuable technical

abilities.  **Aplt. App. at 142** [¶ 12].  Ms. Fullmer also thought that Saville

seemed to be acknowledging his problems, as he admitted that he was "a bit

cranky according to [his] peers," that he would "work on it," and that he had "no

problem changing and underst[ood] the importance."  **Aplee. Supp. App. at**

**187**.  In the 1997 PBC, Ms. Fullmer praised Saville for the efforts he had made,

but put him on notice that he needed to continue to work on his relationship

10

skills, hoping that this would encourage Saville to correct his performance

deficiencies.  **Aplt. App. at 142** [¶ 12].  Ms. Fullmer specified in the 1997 PBC

that "Committment [sic] and long term results will assist in overcoming some of

the remaining barriers."  **Aplee. Supp. App. at 188**.

>    ***Saville's performance problems continued and his attitude became
>    worse during his final ten months of work.***

12.    Saville's performance problems in the key areas of his customer

and peer relations unfortunately did not improve in 1998, as Ms. Fullmer had

hoped.  **Aplt. App. at 142** [¶ 13].  Saville's attitude seemed to have soured.  In

department meetings, he would make negative comments about IBM and his

department.  ***Id.*** [¶ 14].  Saville admits that he was unhappy and had a negative

attitude.  ***Id.* at 94** [431:4-13, 432:3 – 434:6]; **Aplee Supp. App. at 192**.

13.    Ms. Fullmer also became seriously concerned about Saville's

customer relations.  In June 1998, one of IBM's customers, Orem City,

complained to Ms. Fullmer about Saville.  ***Id.* at 142** [¶ 15].  The customer

representative, Clarke Christensen, submitted a declaration on summary

judgment stating that Mr. Saville "was obnoxious and acted inappropriately in

his dealings with me and the other Orem City employees . . . ."  **Aplt. App. at

205** [¶ 3].  Mr. Christensen complained to Ms. Fullmer that Saville would

belittle the customer's system operators and programmers working on the

project and asked that Saville be removed from the project.  ***Id.* at 205-206** [¶ 3],

**142** [¶ 15] & **102-103** [491:8-16, 494:25 – 495:7]; **Aplee. Supp. App. at 196**

[Dep. Ex. 27].

14.    Ms. Fullmer also continued to hear complaints from Saville's peers

that they found him difficult to work with and unapproachable because he made

them feel stupid, that he had a negative attitude, and that he did not display

leadership. **Aplt App. 142** [¶ 16]. Saville introduced no facts to rebut that Ms.

Fullmer received such complaints from peers. *See* **Aplee. Supp. App. at 41** [¶

18] & **84** [¶ 18].

**C.    Ms. Fullmer gave Saville an interim PBC lowering his performance
rating in an effort to improve his performance.**

15.    Because Ms. Fullmer believed that Saville's performance was

headed in the wrong direction and was unacceptable, she decided to give him an

interim PBC review. **Aplt App. at 143** [¶ 17]. An interim review is a way to

tell employees that they are trending toward a low performance rating with the

hope that they will correct their performance before the end-of-the-year review.

*Id.*

16.    In July 1998, Ms. Fullmer met with Saville to discuss his

continuing performance problems and to tell him that he was being reviewed on

an interim basis. **Aplt App. at 87** [383:21-23] & **143** [¶ 18]. She told him his

performance rating was headed downward and, at that time, was a whole level

below what he had been rated for 1997. *Id.* **at 88** [394:5-7] & **143** [¶ 18]. Ms.

12

Fullmer's assessment was based on Saville's negative attitude, lack of

leadership (even though he was being paid as a leader), continued problems

dealing with his peers and customers, and failure to show adequate support for

Ms. Fullmer. *See* **Aplt App. at 88** [392:4 - 393:17] & **143** [¶ 18]. Saville did

not dispute these facts in the district court. *See* **Aplee. Supp. App. at 41-42** [¶¶

19, 20]. The interim PBC was essentially a wakeup call that Saville needed to

improve his performance before the end of the year or his rating would suffer.

**Aplt. App. at 143** [¶ 19].

### D.    Saville complained about his interim PBC to Human Resources and to Ms. Fullmer's supervisor, Brian Myers.

17.    Saville thought that his interim PBC was unfair and submitted an

anonymous e-mail complaint to IBM human resources under IBM's "Speak Up"

program. *See **Id.** at 91* [412:9-18, 413:2-9]; **Aplee. Supp. App. at 192** [Dep.

Ex. 25]. The "Speak Up" program allows employees to raise issues, complaints

or concerns anonymously with human resources personnel. **Aplt. App. at 147**

[¶ 3].

18.    Saville stated in his Speak Up complaint that he thought Ms.

Fullmer gave him the interim PBC in reaction to an allegedly negative employee

opinion survey that she had received about her effectiveness as a manager. *See*

**Aplee. Supp. App. 192-193**; **Opening Brief at 12 ¶ 23 & 13 ¶ 27**. Saville also

acknowledged in his Speak Up complaint that he had an attitude problem,

saying "I think I do have an attitude problem as a result of some of my

manager's action and lack of action and the meeting today certainly reinforced

my attitude in a negative direction." *See* **Aplee. Supp. App. at 192**.

19.    On July 17, 1998, Saville had a follow-up telephone conference

regarding his Speak Up with an IBM Human Resources officer, Pat Pye.  **Aplt.**

**App. at 92** [418:11-13].  Saville discussed, among other things, that some of his

unspecified peers, at unspecified times, might be working overtime but not

recording it.  *Id.* **at 95** [447:23 – 448:1].[4]  Saville also raised his concerns with

Ms. Fullmer's interim PBC.  *Id.* **at 93** [428:24 – 429:1].  Ms. Pye suggested that

Saville discuss his concerns with Brian Myers, his Second-Line Manager to

whom Ms. Fullmer reported.   *See* **Aplee. Supp. App. at 194**.[5]

---

[4] Saville contends that he told Ms. Pye that "the local management was driving
down amounts of overtime to such a low level that it was . . . causing employees to
evade the FLSA."  **Opening Brief at 14 ¶ 30**.  His citations to the record, however, do
not support this fact allegation.  Furthermore, when examining whether there is an
FLSA violation, the question is not whether employees are evading the FLSA, as
Saville suggests he told Ms. Pye, but whether an employer is evading the FLSA.

[5] Saville makes passing reference to the fact that, after his Speak Up, "Ms.
Fullmer ordered him to vacate his desk."  **Opening Brief at 15 ¶ 36**.  This fact is not
probative of any issue in this appeal.  He neither asserts that this was adverse
employment action nor could he.  *See Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847,
857 (10th Cir. 2000).  Moreover, Saville conceded that he retained a home computer
terminal, only came to the office once per week, and he was able to continue his work
notwithstanding the elimination of his desk.  **Aplt. App. at 96-97** [464:14-24, 466:11-
13 & 466:25-467:6].

14

20.     On September 1, 1998, Saville met with Mr. Myers to discuss his concerns.  **Aplt. App. at 98** [474:23-24].  Saville told Ms. Myers that unspecified CEs were grumbling about working overtime but not recording it, due to IBM's micromanagement of overtime.  ***Id.* at 106-107** [510:20 – 511:5].  Saville told Mr. Myers that he thought Ms. Fullmer was not properly managing her group.  *See* **Aplt. App. at 148** [¶ 5]; **Opening Brief at 15 ¶ 39**.  Mr. Myers also took the occasion to express his concern that Saville reportedly had been removed from several customer accounts.  **Aplt. App. at 101** [484:18-21] & **148** [¶ 6].  Saville admitted that he had been taken off the Orem City account at the customer's behest.  ***Id.* at 148** [¶ 6]; **Aplee. Supp. App. at 196**.[6]

21.     Mr. Myers told Saville that he would investigate Saville's concerns by interviewing other members of his work group.  **Aplt. App. at 103** [495:8-15].

---

[6] In his response to summary judgment, Saville disputed that he admitted being taken off the Orem City account.  **Aplee. Supp. App. at 43-44** [¶ 25].  Saville, however, did admit this to Mr. Myers and merely tried to blame the customer.  **Aplt. App. at 102** [492:5 – 493:1]; **Aplee. Supp. App. at 196**.  In his Opening Brief, at p. 16 ¶ 41, Saville suggests that he provided an explanation to Mr. Myers as to why his removal from Orem City was in fact the customer's fault.  The reference to the record, **Aplt. App. at 102**, however, only provides Saville's justification for what happened with Orem City, but does not evidence that he ever provided such detailed explanation to Mr. Myers.  Significantly, Saville's explanation does not alter the undisputed fact that the customer complained to Ms. Fullmer about Saville being rude and obnoxious.  *See* **Section III.B. ¶ 13**, *supra*.

22.     After his September 1, 1998 meeting with Saville, Mr. Myers

investigated Saville's concerns by interviewing three members of his group.  He

concluded that Saville's concerns were without merit and, instead, that Saville

had serious communication problems with Ms. Fullmer and customer engineers.

**Aplt. App. at 148** [¶ 7]; *see also* **Opening Brief at 17-18 ¶¶ 46-47**.  Saville

presented no evidence to the district court to contradict Mr. Myers' testimony on

this point.  **Aplee. Supp. App. 45** [¶ 27] & **86** [¶ 27].[7]

**E.     Having seen continued problems with Saville's performance, Ms.
         Fullmer decided to give him a choice to go on an improvement plan
         or separate from the company with severance.**

23.     Ms. Fullmer continued to see problems with Saville's performance

following the interim PBC.  **Aplt. App. at 143** [¶ 20].  For example, during a

September meeting of the CEs under her supervision, Saville interrupted her and

made several comments that she perceived as undermining her authority and

denigrating IBM.  ***Id.***  Ms. Fullmer perceived his comments as suggesting that

---

[7] Saville likewise has not pointed to any evidence in the record contradicting Mr. Myer's testimony.  On page 16, ¶ 43, of his Opening Brief, he suggests that Mr. Myers interviewed a Mr. Dalton and Mr. Greaves, who purportedly "later told Mr. Saville that they had told Mr. Myers that they appreciated Mr. Saville's mentoring and support and Mr. Dalton wrote a letter to that effect."  These facts are neither admissible, as they are hearsay, nor supported by the pages of the record that Saville cites.  The unspecified cited pages of his deposition testimony (**Aplt. App. 103**) merely state that Saville was told by Messrs. Dalton and Greaves that they met with Mr. Myers, which is hearsay, but say nothing about what Messrs. Dalton or Greaves might have told Mr. Myers.  The letter from Mr. Dalton (**Aplt. App. at 216-217**), is unsigned, says nothing about what he may have told Mr. Myers, and, in any event, is hearsay.

16

IBM did not value its people and that the CE group should look for jobs elsewhere. *Id.* She understood his other comments to suggest that IBM management did not know what it was doing, but that he did because he had been with the company for 32 years. *Id.* Saville presented no evidence to the district court to contradict Ms. Fullmer's testimony on these points, *compare* **Aplee. Supp. App. 45-46** [¶ 28] *with* **86** [¶ 28], which testimony was based on her attendance at the meetings and her rational perception and, therefore, admissible. *See, e.g., Gust*, 162 F.3d at 595.

24.    Additionally, another customer to whom Saville had been assigned told Ms. Fullmer that it was dissatisfied with his service and demanded that IBM replace him with another CE. **Aplt. App. at 143-144** [¶ 21] & **110-111** [530:15-531:25].[8]

25.    Ms. Fullmer decided that her softer approach was not working and that Saville needed stronger persuasion. *Id.* **at 144** [¶ 22]. She met with her manager, Mr. Myers, sometime in late September 1998 and explained that she was not getting results from informal efforts to improve Saville's performance. She told him she was experiencing more and more problems with Saville and

---

[8] In his summary judgment response, Saville did not proffer evidence contradicting Ms. Fullmer's testimony that another customer had complained, but just claimed that such testimony is hearsay. He is incorrect, as shown in **Section IV.B.4.b., p. 55 n.18**, *infra*.

17

that she had, therefore, decided to put Saville on a formal performance

improvement plan. *Id.* Mr. Myers also suggested offering Saville the

alternative option of a severance package if he were unwilling to go on the

performance improvement plan. Ms. Fullmer agreed with this approach. *Id.*

26.    Mr. Myers already had a meeting scheduled with Saville so he

anticipated explaining the options to Saville in general terms, but expected Ms.

Fullmer would provide details in a follow-up meeting. **Aplt. App. 144** [¶ 23].

**F.    Saville opts to retire and file a lawsuit against IBM instead of
continuing his employment on a performance improvement plan.**

27.    Mr. Myers met with Saville on September 30, 1998. **Aplt. App. at**

**149** [¶ 10]. Mr. Myers reported that his interviews with Mr. Saville's peers had

not confirmed Saville's complaints that Ms. Fullmer was the problem. Mr.

Myers said that the interviews had instead revealed that Saville had serious

performance problems. *Id.* Mr. Myers told Saville that his attitude, leadership,

mentoring and support for Ms. Fullmer were unacceptable and that his attitude

problem was causing customer complaints. *Id.* **at 149** [¶ 11] & **115** [565:19-25].

Mr. Myers also told Saville that he was very concerned with the customer

complaints. *Id.* **at 149** [¶ 11]. This was unacceptable from a leadership point of

view. *Id.*

28.    Saville responded, in part, by admitting that he had a negative

attitude, but blamed it on how he felt he had been treated by management. **Aplt.**

18

**App. at 116** [567:7 – 568:2]. Mr. Myers told Saville that his job required him to step up to his leadership role and provide the necessary mentoring to employees who were less experienced. ***Id.* at 149** [¶ 11]. Myers explained that Saville needed to make an effort to turn things around and that the changes had to be made now. ***Id.*** Mr. Myers then explained that Saville would have the option of going on a performance improvement plan or leaving IBM with a severance package. **Aplt. App. at 149** [¶ 12] & **118** [580:6-24]. He concluded the conversation by saying that Ms. Fullmer would provide further details regarding the options. ***Id.* at 149** [¶ 12] & **119** [583:8-11].[9]

29.     On October 5, 1998, Ms. Fullmer met with Saville and laid out his options in more detail. ***Id.* at 119** [586:12-14]. She told him that he had fallen short of his job expectations and could go on a thirty-day improvement plan to correct his problems with performance, leadership, support of his peers, support of management, team work and customer satisfaction. ***Id.* at 120, 123** [588:12-18, 601:20-25] & **144** [¶ 24]. Alternatively, Saville could immediately leave IBM and accept a severance package. ***Id.* at 121-122** [594:21-595:3]. Ms. Fullmer told Saville that he had 30 days to decide. ***Id.* at 123** [601:7-10].

---

[9] Saville contends that Mr. Myers also told him that he "wanted [Saville] out of IBM." **Opening Brief at 18 ¶ 48**. Although IBM disputes that Mr. Myers made that comment, it is immaterial, as Saville admits that Mr. Myers told him that he had the option of going on a performance improvement plan. **Aplt. App. at 119** [583:1-11].

30.     Saville does not dispute the foregoing regarding Ms. Fullmer's notice of the performance improvement plan, but contends that he asked her for a written description of the plan and that Ms. Fullmer did not give it to him. **Opening Brief at 19 ¶ 53**.  It was undisputed in the district court, however, that Ms. Fullmer did not give Saville a written description of the performance improvement plan because he retired rather than going on the plan.  **Aplt. App. at 197** [¶ 2].  Saville admitted that his memory was poor about the specific details of the plan that Ms. Fullmer discussed with him, ***id.* at 120-121** [589:23 – 590:1, 592:2-6], but he did recall that she said the performance plan would need to address "performance issues, leadership issues, lack thereof; support of peers in teams, support of management; teamwork; customer satisfaction." ***Id.* at 123** [601:20-25].

31.     Saville also contends that Ms. Fullmer told him that if she received one customer complaint during the 30-day window of the performance improvement plan, he would be fired.  **Opening Brief 19 ¶ 53**.

32.     A performance improvement plan does not automatically result in termination.  **Aplt. App. at 145** [¶ 25] & **149-150** [¶ 13].  It is a real opportunity for an employee to correct deficient performance and avoid termination.  ***Id.***  In fact, Mr. Myers had experience with employees successfully completing performance improvement plans.  ***Id.***  So did Saville:  as an IBM manager, he

20

had placed six different employees on improvement plans, all of whom succeeded. *Id.* at 126 [622:3-10].

33.    Whereas most people who claim they are the victims of discrimination "want jobs, not lawsuits," *Ford Motor Co. v. EEOC*, 458 U.S. 219, 230 (1982), Saville appears to be an exception. Instead of pursuing the employment opportunities available to him at IBM, Saville rejected both of the options presented by Ms. Fullmer, and chose to retire and to receive benefits under IBM's Retirement Plan. **Aplt. App. at 127** [625:7-19]; **Aplee. Supp. App. at 198**. He requested separation code "8J" from IBM human resources to take advantage of a particular retirement option. **Aplt App. at 127** [624:13 – 625:3] & **198** [¶ 3]. Saville retired from IBM on October 30, 1998. *Id.* at 129 [633:18-24]. [10]

_____

[10] Saville attempts to justify his rejection of continued employment by asserting that "his experience as an IBM manager led him to believe that without a written, specific improvement plan in place, employees rarely succeeded in remaining employed with IBM." **Opening Brief 19-20 ¶ 54**. This assertion is without any citation to the record or support therein. Moreover, it does not rebut the undisputed fact that Saville had the option of remaining employed under a 30-day performance improvement plan during which, according to his own description of plan's requirements, he only needed to avoid aggravating customers and causing them to complain about him to management.

**G.    Although Saville informed Ms. Pye and Mr. Myers that his peers were grumbling about working but not recording overtime, he never complained that IBM was violating the overtime laws to anyone, and he never even voiced such concerns to the decision maker, Ms. Fullmer, who took action based solely on Saville's unacceptable performance.**

34.    In late 1997, Ms. Fullmer introduced an IBM directive to reduce the amount of overtime worked by CEs in an effort to control costs. **Aplt. App. at 76** [275:1-4, 277:2-8]. Ms. Fullmer asked employees, including Saville, to try to limit overtime whenever possible and set a target limit of 10 percent overtime. *See* **Aplt. App. at 61** [122:21-24] & **63** [169:13-25]. As Saville admits, this directive was lawful. *See* **Aplt. App. at 64** [180:2-5] & **76** [ 276:16 – 277:8].

35.    From the time the directive was announced, through early 1998, Saville and Ms. Fullmer had ongoing email discussions about how he could meet the directive. *See* **Aplt. App. at 76** [275:5 – 277:8]. Ms. Fullmer responded to Saville's concerns by telling him to record his overtime as "correctly and as accurately and timely as possible." ***Id.* at 77** [281:2-14] & **Aplee. Supp. App. at 206**. Indeed, Saville knew that he was to report his overtime, **Aplt. App. at 67** [190:15-22], and he was paid for all overtime he worked, ***id.* at 64** [179:13-15].

36.    Saville contends that he complained to Ms. Fullmer that the overtime directive was "causing problems in morale on his team" and that he had "many verbal and e-mail discussions with Ms. Fullmer regarding

monitoring and administering overtime." **Opening Brief at 10-11 ¶ 17.** This

fact statement, which is not supported by the record, does not even suggest that

Saville was voicing complaints about overtime violations to Ms. Fullmer.

Moreover, he admitted that he never complained to Ms. Fullmer that he believed

IBM was violating the overtime laws. *See* **Aplt. App. at 108-109** [521:3-20,

523:17 – 524:12] (stating that the only complaints Saville allegedly made about

overtime were to Ms. Pye and Mr. Myers). Saville never told Ms. Fullmer that

he thought her emails to him regarding overtime were inappropriate. **Aplt. App.**

**at 84** [359:9-13]. Indeed, during oral argument on IBM's motion for summary

judgment, Saville's counsel conceded that Saville's dialogue with Ms. Fullmer

about overtime "probably is not considered protected activity." *Id*. **at 223** [lines

1-7, 13-14 & 23-24].

     37.    The only evidence of alleged overtime complaints that Saville

proffered to the district court were the concerns that he raised with Ms. Pye and

Mr. Myers, discussed *supra* at pp. 14-15 ¶¶ 19, 20. **Aplt. App. at 108-109**

[521:3-20, 523:17-524:12]. He told Ms. Pye, during their July 17, 1998 Speak

Up telephone conference, and later Mr. Myers during their September 1, 1998

meeting, that several unspecified CEs were grumbling because they were

working overtime and not recording it because of the way IBM was

"micromanaging" overtime.  **Aplt. App. at 101** [485:6-12] & **106-107** [510:13-511:5].[11]

38.    As Saville readily admits, Ms. Fullmer had no knowledge of his alleged complaints about overtime practices to Ms. Pye or to Mr. Myers, or that he had made his Speak Up complaint.  **Aplt App. at 113** [541:5-542:12] & **145** [¶ 27].

39.    Saville speculates that Ms. Pye and Ms. Myers must have told Ms. Fullmer about his peers' grumblings about overtime.  **Aplee. Supp. App. at 50-51** [¶ 39].  Saville, however, proffered no evidence to support his conspiracy theory.  *See id.  See also* **Aplt. App. at 359** (finding that the record is devoid of any evidence of communications between Ms. Fullmer, Ms. Pye and Mr. Myers regarding Saville's alleged overtime complaints).  Accordingly, the record was

---

[11] Saville attempts to establish that he knew his peers were working overtime but not recording it in response to IBM's overtime directive.  *See* **Opening Brief at 11 ¶ 19**.  In support, he cites his declaration which attaches purported overtime "reports," filled with his handwritten notations, allegedly showing that overtime was reduced in 1998 as compared to previous years.  Saville has introduced no evidence supporting his bald assertion, in paragraph 19, that he "did not observe a significant reduction in workload to justify such a dramatic decrease in overtime . . . and determined that the local office's crackdown on overtime was leading his peers to work overtime without recording it . . . ."  *Id.*  The fact that less overtime was being worked, alone, does not suggest anything about whether it was due to the company's lawful efforts or because employees were working without recording overtime.  Furthermore, Saville never made specific reference to this material in the district court, and it should be disregarded on appeal for that reason as well.  *See, e.g., Downes v. Beach*, 587 F.2d 469, 472 (10th Cir. 1978) ("While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out.").

undisputed that Ms. Fullmer had no knowledge that Saville had raised any complaints about alleged illegal overtime practices before her decisions to give him an interim PBC lowering his performance rating or to place him on a performance improvement plan.  **Aplt App. at 113** [541:5 – 542:12] & **145** [¶ 27].

40.    Moreover, Ms. Fullmer's decisions to give Saville an interim PBC and then, when that did not work, to place him on a performance improvement plan were solely based on Saville's repeated failures to meet his job requirements.  **Aplt App. at 145** [¶ 27].  Saville proffered no evidence to contradict these facts.  **Aplee. Supp. App. at 51** [¶ 40] & **88** [¶ 40].

## IV.    ARGUMENT

### A.    SUMMARY OF ARGUMENT

Faced with repeated complaints from Saville's peers that they did not feel comfortable approaching him for advice or training and from customers who were alienated due to his rude and adversarial communications style, and having already counseled Saville that his performance was unacceptable in these key areas, Saville's manager, Ms. Fullmer, decided to place him on a performance improvement plan.  Rather than accepting ownership for his performance problems and taking the opportunity offered by Ms. Fullmer to remedy those problems, Saville opted to retire from IBM in October 1998.

25

Saville claims that Ms. Fullmer and IBM forced him to retire in retaliation for complaints he made about alleged overtime violations. This claim is unfounded and was properly dismissed on summary judgment because Saville failed to carry his burden on every element of his FLSA retaliation claim. First, Saville failed to state a *prima facie* case because he did not proffer evidence creating a genuine dispute of fact on adverse employment action, protected activity, or a causal connection between any alleged adverse employment action and his alleged protected activity.

First, Saville did not create a genuine fact dispute that he suffered an adverse employment action. Although he contends that he was constructively discharged, the undisputed facts show that he retired, for his own reasons, and not because of intolerable working conditions.

Saville's evidence also did not create a genuine dispute that there was a causal connection between his alleged overtime complaints and the decision to place him on a performance improvement plan. The decision maker, Ms. Fullmer, did not know that Saville had engaged in any alleged protected activity until after he had already retired from IBM.

Furthermore, Saville did not raise a genuine dispute of fact on the issue of protected activity. The only complaints that Saville made about overtime to Ms. Fullmer were in the form of resistance to her lawful directive to reduce the

26

amount of overtime worked by Saville and his peers. Saville agrees that these efforts were lawful, that he never complained that IBM failed to pay him overtime, and that he was always paid for overtime. Saville's complaint to his second-line manager, Mr. Myers, that Saville's peers were grumbling about working but not reporting overtime was likewise not a complaint that IBM was violating the overtime laws and, thus, not protected activity. Saville utterly failed to make a *prima facie* case.

Even if Saville had presented a *prima facie* case, IBM had legitimate nondiscriminatory reasons for its actions. Ms. Fullmer received repeated reports from Saville's peers and customers that his adversarial communications style was alienating his peers and IBM's customers to the point where certain of them did not want to work with him. Even though Ms. Fullmer confronted Saville with these problems, before he had ever raised concerns about his peers working but not recording overtime, she continued to receive the same types of complaints. Furthermore, Saville inappropriately challenged Ms. Fullmer's authority in group meetings and denigrated her and other IBM management to his peers. The undisputed facts show that Ms. Fullmer was motivated solely by these serious and repeated performance issues in deciding to place Saville on a performance improvement plan. Saville failed to introduce any evidence of pretext.

27

In an effort to generate facts that he believes bolster his position, Saville has, in several instances, distorted the evidence in the record.  Saville has done this by citing testimony to establish certain facts, which the cited testimony simply does not support.  In some cases, he has taken this embellishment a step further by re-characterizing the facts a second time in his argument section so that they do not even track the facts he has asserted in his fact section.

A good example of this invalid tactic is found at page 43 of the Opening Brief, where Saville states that "Vickie Fullmer knew about his concerns of how IBM Northern Utah office's practices were compelling overtime evasion on the part of his peers."  Saville gives no citation to the record supporting this arguably important fact.  Going back to the fact section of his brief, the closest fact he has presented is in paragraph 17, which states that "In November 1997, Mr. Saville had begun complaining to Ms. Fulmer, [sic] that IBM Northern Utah's emphasis on limiting overtime to a maximum of 10% of salary was causing problems in morale on his team."  *See* **Opening Brief at 10 ¶ 17**.  Saville gives no record cite for this fact, either, which is not surprising as an exhaustive search of the record reveals no evidence of such complaints to Ms. Fullmer.

Notwithstanding Saville's efforts to manufacture facts in his brief that do not exist in the record, he has failed to adduce evidence supporting all three

28

elements of his *prima facie* case and on the element of pretext.  Accordingly, the

district court's grant of summary judgment on Saville's sole claim for FLSA

retaliation should be affirmed.

**B.     AS THE DISTRICT COURT CORRECTLY RULED, SAVILLE FAILED TO PROFFER FACTS ESTABLISHING A GENUINE DISPUTE OF MATERIAL FACT AS TO EACH ELEMENT OF HIS CLAIM FOR FLSA RETALIATION**

As Saville correctly notes in his Opening Brief, a plaintiff asserting a

claim of FLSA retaliation must first establish a *prima facie* case with the

following elements:  (a) that he engaged in activity protected by the FLSA, (b)

that he suffered adverse employment action by IBM after his protected activity,

and (c) a causal connection between the protected activity and the adverse

employment action.  *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1394

(10th Cir. 1997).  If there is sufficient evidence to establish each element of the

*prima facie* case, the defendant is then required to proffer a legitimate non-

discriminatory reason for its alleged adverse employment actions, following

which the plaintiff is required to produce competent evidence of pretext.  *Id.* at

1395-1396.  With respect to Saville's FLSA claim, the district court correctly

ruled, based on the record before it on summary judgment, that Saville could

neither make a prima *facie case* nor show pretext.

29

**1.      The District Court Correctly Found No Evidence Of Adverse Employment Action As Saville Presented No Valid Justification Why He Did Not Take The Reasonable Option Of Continuing His Employment And Trying To Succeed Under The Performance Improvement Plan Rather Than Retiring.**

IBM begins its analysis with the element of adverse employment action because Saville's inability to establish a *prima facie* case is most starkly seen with this element.  Saville relied on only one alleged adverse employment action:  he claims that his retirement from IBM in October 1998 was a constructive discharge.  *See* **Opening Brief at 30**.  He failed to meet the high burden of proving constructive discharge.

The law in the Tenth Circuit is clear that "[c]onstructive discharge requires considerably more proof than establishing unpleasant working conditions."  *Woodward v. City of Worland*, 977 F.2d 1392, 1402 (10th Cir. 1992), *cert. denied*, 509 U.S. 923 (1993).  Instead, "a constructive discharge requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but intolerable."  *Tran v. Trustees of the State Colleges in Colo.*, 355 F.3d 1263, 1271 (10th Cir. 2004).  The employee must show that the employer "by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign."  *Ramsey v. City & County of Denver*, 907 F.2d 1004, 1010 (10th Cir. 1990) (quotation omitted).  "In contrast, a plaintiff who voluntarily

30

resigns cannot claim that he or she was constructively discharged." *Exum v.*

*U.S. Olympic Committee*, 389 F.3d 1130, 1135 (10th Cir. 2004).  "[T]he

voluntariness of an employee's resignation [is judged] under an objective

standard, looking to whether his or her working conditions were so intolerable

that a reasonable employee would have had no other choice but to quit."  *Id.* at

1135-1136.

   Here, the undisputed facts showed that Saville had an obvious, reasonable

alternative to resignation:  he had the option of continuing employment under a

performance improvement plan.  Courts have consistently found that such

options negate a finding of constructive discharge as a matter of law.  For

example, in *Hillman v. Safeco Ins. Co. of America*, the court addressed an

employee's claim that he had been forced to resign when his company placed

him on an improvement plan:

> When an employer presents an employee with legitimate options
> for continued employment that generally precludes a finding of
> constructive discharge. . . .  Therefore, when an employer gives an
> employee a realistic option of improving his or her situation, and
> the work environment is not otherwise unreasonably intolerable, the
> employee cannot claim that he or she was forced to retire.

190 F. Supp. 2d 1029, 1036-1037 (N.D. Ohio 2002), *aff'd*, 2003 U.S. App.

LEXIS 8703 (6th Cir. May 6, 2003).  The court held that "by placing [plaintiff]

on a performance plan, Safeco attempted to correct the problems it perceived

with [plaintiff's] performance.  Even though only a small percentage of people

31

placed on the performance plan still remain employed by Safeco, being placed

on such a plan does not necessarily indicate that termination is imminent." *Id.* at

1037.  Accordingly, the court held that "the option for continued employment in

the performance plan preclude[d] a finding of constructive discharge." *Id.* at

1038.

The result was almost identical in *Peecook v. Northwestern Nat'l Ins.*

*Group*, 1998 U.S. App. LEXIS 18265, at *13 (6th Cir. Aug. 3, 1998)

(unpublished; copy attached at **Aplee. Supp. App. at 250**).  In that case, the

court held that a plaintiff was not constructively discharged where he was given

a choice of a performance plan with the opportunity to correct performance

issues or voluntary retirement with severance.  *Id.* at *13.  The court reasoned

that, "a plaintiff cannot claim to be constructively discharged where he refuses

to comply with the known expectations of his employer." *Id.*

Similarly, in *Agnew v. BASF Corp.*, 286 F.3d 307 (6th Cir. 2002), the

plaintiff was placed on a performance plan, in part because of customer

complaints, and argued that termination would have been the inevitable result.

The court held that, although termination was a possibility if the plaintiff did not

complete the plan, it was a possibility "contingent on future developments,

rather than being a present plan or decision." *Id.* at 310.  Moreover, "[a]n

employer does not constructively discharge an employee simply by advising him

that he must be productive in order to retain his new job." *Id.* at 310 (internal quotation omitted). Instead, "[a]n employee who quits a job in apprehension that conditions may deteriorate later is not constructively discharged." *Id. See also Seely v. Runyon*, 1998 U.S. App. Lexis 31311 **5-6 (10th Cir. 1998) (holding that a retraining program required due to supervisory dissatisfaction with job performance was not constructive discharge) (unpublished; copy attached, **Aplee. Supp. App. at 262**); *Caslin v. General Electric Co.*, 696 F.2d 45, 47 (6th Cir. 1982) ("The fact that plaintiff's supervisor implemented a three-month 'improvement program' when [plaintiff] protested his [performance evaluation] would not support a finding that the employer deliberately made plaintiff's working conditions intolerable."); *McCullough v. St. Francis Hospital & Medical Center, Inc.*, 1987 U.S. Dist. LEXIS 8695, at **25-26 (D. Kan. Sept. 22, 1987) (probationary period for performance evaluation did not constitute constructive discharge; "Although we agree that a reasonable person would find poor evaluations and probation to be disagreeable, we find no evidence that defendant's actions made working conditions intolerable.") (unpublished; copy attached at **Aplee. Supp. App. at 241** ).

The reasoning of the foregoing cases applies directly here. IBM offered Saville the alternative of going on a performance improvement plan to address deficiencies in his relations with his peers and customers or retiring with

33

enhanced separation benefits.  He has no evidence of intolerable conditions.

Saville had a real opportunity to correct his problems, just as other employees

had done.  Thus, as a clear alternative to resignation, Saville had the choice of

remaining employed under the improvement plan.

     Saville is mistaken that he can prove constructive discharge merely by

asserting that it was "in [his] best interest" to resign.  **Opening Brief at 34**.  This

diluted standard is not supported by any authority and is directly contrary to the

above-cited Tenth Circuit cases.  He must show that conditions were so

objectively intolerable that he had no choice but to quit.  *See, e.g., Tran, supra*.

     Saville's efforts to show intolerable conditions fell  far short of the mark.

He first suggested that the performance review plan that Ms. Fullmer offered

him was somehow a sham because it was only 30 days and he had not received

written specifics regarding its terms.  *See* **Opening Brief at 32-33**.  Neither of

those aspects of the plan excuses Saville's failure to try it as an alternative to

resignation.

     First, the record establishes that the only reason Ms. Fullmer did not give

Saville a written description of the performance improvement plan was because

she was waiting to see if he would take that option before drafting the plan, and

he retired rather than accepting the plan.  *See* **Aplt. App. at 197** [¶ 2].  *Cf. Baer

v. Scotts Co.*, 2001 Ohio App. LEXIS 5372, at *21 (Ohio Ct. App. Dec. 6, 2001)

(plaintiff not given plan in writing but advised that "specific development plans

would be spelled out in a performance plan") (unpublished; copy attached,

**Aplee. Supp. App. at 208**); *Peecook,* 1998 U.S. App. LEXIS 18265, **5-6

(plan not in writing); *Caslin*, 696 F.2d at 47 (plan not in writing).  Saville's

contention that Ms. Fullmer "probably would have been unwilling or unable to

provide any written details after he agreed" lacks any supporting evidence and

should be disregarded as sheer speculation.  *See* **Opening Brief at 36**.

Moreover, Saville admitted that Ms. Fullmer told him the performance plan

would address "leadership issues, lack thereof; support of peers in teams,

support of management; teamwork; customer satisfaction."  **Aplt. App. at 123**

[601:20-25].  Thus, Saville knew where Ms. Fullmer expected to see

improvement in his performance.  *See Agnew v. BASF Corp.*, 286 F.3d at 310

(holding that plan that required employee to complete plan "with an acceptable

level of performance" was reasonable alternative to resignation).

Second, Saville has no authority for his contention that giving an

employee 30 days, as opposed to 90 days, to correct performance is insufficient

as a matter of law and constitutes constructive discharge.[12]  Although he asserts

---

[12] Indeed, the duration of the plan was not dispositive in any of the cases
holding that  the option of a performance improvement plan precludes a finding of
constructive discharge.  *See Agnew v. BASF Corp.*, 286 F.3d at 310 (duration of the
plan was not material to court's holding); *Hillman v. Safeco Ins. Co.*, 190 F. Supp. 2d
1029 (N.D. Ohio 2002) (making no mention of the duration of the plan in its holding);

that 90 days was "standard," **Opening Brief at 35**, he offers no evidence that

there was any standard duration for performance improvement plans at IBM.

Moreover, beyond his speculation, Saville has presented no evidence explaining

why he would not have been able to improve in the areas outlined by Ms.

Fullmer in a 30-day timeframe.  Indeed, during oral argument on the motion for

summary judgment, Saville's counsel candidly admitted that the plan did not

present an insurmountable hurdle to Saville's continued employment:

> THE COURT: . . . [Y]ou're telling me he is not capable of
> performing for 30 days without getting a complaint when he knows
> he's being watched every instant?
>
> MR. HOLDSWORTH:  No, I'm not, I'm not suggesting that.

**Aplt. App. at 250** [lines 11-15].

Nor does Saville present a basis for finding constructive discharge with

his new theory, not alleged below, that "IBM's policy with respect to

performance improvement plans was that if the criteria for the improvement

plan was violated, even a year or more after the successful completion of the

plan, the employee is subject to immediate dismissal."  **Opening Brief at 35**.

As a preliminary matter, the Court should disregard this argument altogether

---

*Seely v. Runyon*, 1998 U.S. App. LEXIS 31311, at *8 (same); *Peecook v. Northwestern Nat'l Ins. Group*, 1998 U.S. App. LEXIS 18265, at **11-13 (same); *Caslin v. General Elec. Corp.*, 696 F.2d at 47 (same); *Leonard v. Gates Rubber Co.*, 2001 U.S. Dist. LEXIS 21377, at **10-11 (W.D. Ky. 2001) (same) (copy attached, **Aplee. Supp. App. at 236**).

because Saville raised it for the first time on appeal and without any evidentiary support. *Shoels v. Klebold*, 375 F.3d 1054, 1062 (10th Cir. 2004) (holding that to preserve an issue for appeal, a party must present the legal basis of the claim to the district court clearly and explicitly). Even if it were supported and had been raised below, however, the contention that the plan might have lasted up to a year does not establish intolerable working conditions necessary to show constructive discharge. *See Agnew v. BASF Corp.*, 286 F.3d at 310 (holding that the possibility of being terminated under a plan is "contingent on future developments, rather than being a present plan or decision" and that "[a]n employee who quits a job in apprehension that conditions may deteriorate later is not constructively discharged.").

Similarly, Mr. Myers' alleged comment that he "want[ed] Saville out of IBM" did not transform the offer of a performance improvement plan into a constructive discharge. Even assuming this comment was made, which IBM does not contest here, Saville admits that he understood that he had the option of going on a performance improvement plan. *See* Section III.F, pp. 18-19 ¶¶ 28 & 29 & n. 9, *supra*. Moreover, Saville remained employed for a full month after this alleged comment by Mr. Myers, during which time Saville was exploring his options. Thus, Saville cannot now claim that he thought the alleged comment by Mr. Myers was tantamount to being fired.

37

Again, Saville must show that the circumstances of his employment were
intolerable such that he had no reasonable option but to quit. *Woodward v. City
of Worland*, 977 F.2d at 1401. He has not explained, either in the district court
or in his Opening Brief, why he could not have simply accepted the performance
improvement plan and attempted to succeed under it for 30 days. He has
likewise not explained why he could not have performed his duties without
generating customer or peer complaints for 30 days. His speculation that he
"would not survive the plan" and would have been terminated does not carry his
burden of proving constructive discharge. *See Garner v. Wal-Mart Stores, Inc.*,
807 F.2d 1536, 1539 (11th Cir. 1987) (holding "[p]art of an employee's
obligation to be reasonable is an obligation not to assume the worst, and not to
jump to conclusions too fast.").

Accordingly, Saville failed to establish constructive discharge, his sole
basis for proving adverse employment action, and the district court's summary
judgment must be affirmed.

> **2.     Saville Failed To Introduce Any Evidence Raising A Genuine
> Dispute Of Fact That The Decision Maker, Ms. Fullmer, Knew
> Of His Complaints About Alleged Illegal Overtime Practices Or
> Otherwise Show A Causal Connection Between His Complaints
> And Any Alleged Adverse Employment Action.**

Even assuming, for sake of argument, that Saville could establish adverse
employment action, he has failed to demonstrate that it was causally connected

#1108762 v1

to any complaints that he made concerning alleged illegal overtime practices. An employer cannot engage in unlawful retaliation where the person making the alleged adverse employment decision does not know that the employee has opposed or is opposing a violation of law. *See Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (holding that "an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing" a violation of law); *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993) (holding no causal connection shown where supervisor who made the decision to remove plaintiff was unaware that plaintiff had engaged in protected activity).

Here, the facts are undisputed that Ms. Fullmer was the decision maker with respect to the adverse employment action (constructive discharge) alleged by Saville. She made the decision to place him on a performance improvement plan. Thus the relevant inquiry is whether there is any proof that Ms. Fullmer did this in response to Saville's complaints about alleged illegal overtime practices. The record is clear that Ms. Fullmer never knew of such complaints until after Saville retired so could not have been retaliating for those complaints.

Saville proffered no evidence that he complained directly to Ms. Fullmer that IBM was violating overtime laws. Notwithstanding his attempts to re-characterize his discussions with Ms. Fullmer as complaints about FLSA

violations (*see* **Opening Brief at 43**), the record is devoid of any evidence to support this contention. His statement that Ms. Fullmer "knew about his concerns of how IBM Northern Utah office's practices were compelling overtime evasion on the part of his peers," ***see id.***, lacks any citation to evidence. Accordingly, there is no evidence that Saville made any overtime complaints directly to Ms. Fullmer.

Saville's only arguably protected activity was telling Ms. Pye, during his August 19, 1998 Speak Up, and then Mr. Myers, during their September 1, 1998 meeting, that unspecified CEs were grumbling to Saville that they were working but not recording overtime. Saville speculates that Ms. Fullmer also knew about these conversations with Ms. Pye and Mr. Myers (**Opening Brief at 43**), but he offers no proof of this. The only evidence in the record is that Ms. Fullmer did not know that Saville was voicing these concerns about his peers not recording overtime until after Saville had retired, and long after she had allegedly taken adverse employment action against him. **Aplt. App. at 145** [¶ 27]. Saville's testimony on this point was unequivocal:

> Q.    Did you tell Ms. Fullmer that you had complained to Ms. Pye regarding her management style with respect to overtime?
>
> A.    Ms. Fullmer didn't know that I had talked to Ms. Pye.
>
> Q.    Did you ever tell Ms. Fullmer that you had complained to Ms. Pye about her overtime practices?

40

       A.     No.

       Q.     Did you ever tell Ms. Fullmer that you had complained to Mr. Myers regarding her overtime practices?

       A.     No.

       . . .

       Q.     Did you ever tell Ms. Fullmer that you had complained to anyone above her in management regarding any of her management practices?

       A.     No.

**Aplt App. at 113** [541:5 – 542:12].  As the undisputed evidence shows that Ms. Fullmer did not know about Saville's alleged protected activity, she could not have been retaliating against him.

Moreover, the timeline of the alleged adverse employment action is inconsistent with retaliation for a separate reason.  Again, Saville's alleged protected activity was raising what he believed to be illegal overtime practices with Ms. Pye and then with the manager for his region, Mr. Myers.  He did not voice these concerns until after Ms. Fullmer had already given him an interim PBC, lowering his performance rating, and had counseled him for the very same types of performance problems that resulted in her decision to place him on a performance improvement plan, which Saville asserts was the *coup de grace*. Also, Saville admits that the interim PBC was motivated by the negative employee opinion survey that Ms. Fullmer received, not by any overtime

41

complaints.  *See* **Aplee. Supp. App. at 192**; **Opening Brief at 12 ¶ 23**.  In other words, the protected activity—the alleged retaliatory motive—did not even exist at the time when Ms. Fullmer began the process Saville deems adverse employment action.  Indeed, it was the interim PBC that triggered Saville to complain to Ms. Pye and then to Mr. Myers.  Accordingly, there can be no inference that Ms. Fullmer acted in retaliation for the complaints raised with Ms. Pye and Mr. Myers.  *See Guevara v. Best Western Stevens Inn, Inc.*, 2003 U.S. App. LEXIS 21615, at **5-6 (10th Cir. October 22, 2003) (holding no inference of causal connection where defendant's written warnings to plaintiff about poor performance after protected activity were consistent with warnings given before protected activity) (unpublished; copy attached, **Aplee. Supp. App. at 232**); *Ring v. Sears, Roebuck & Co.*, 250 F. Supp. 2d 1130, 1135-1136 (D. Minn. 2003) (holding that where documentation of performance problems precedes alleged protected activity, the inference of retaliation is negated).

Finally, this Court should give no credit to Saville's speculation that Ms. Fullmer was "working off the same script" as Mr. Myers and Ms. Pye or that "Saville's protected activity had motivated Mr. Myers to influence Ms. Fullmer [and] . . . [to] pull[] [her] strings.  *See* **Opening Brief at 43, 45**.  None of Saville's contentions in those pages—regarding Ms. Fullmer and Mr. Myers allegedly "formulating the end game strategy of a performance improvement

42

plan"—are supported by any citation to the record.  Saville's contentions are all

based on "mere speculation, conjecture, or surmise," unsupported by evidence,

which is insufficient to defeat summary judgment.  *See, e.g., Rice v. United*

*States*, 166 F.3d 1088, 1092 (10th Cir. 1999).

In summary, the undisputed evidence in the record is that Ms. Fullmer did

not know about Saville's conversations with Ms. Pye and Mr. Myers and that

Ms. Fullmer solely made the decision to place Saville on a performance

improvement plan herself.  Thus, Saville has failed to demonstrate a causal

connection and summary judgment must be affirmed for this reason alone.

> **3.      Saville Failed To Show Protected Activity; Neither His
> Resistance To Ms. Fullmer's Lawful Directives To Reduce
> Overtime Nor His Notification That Coworkers Allegedly Were
> Grumbling About Working, But Not Recording, Overtime
> Constitutes Protected Activity.**

To demonstrate protected activity, Saville must show that he raised good-

faith, reasonable complaints about alleged illegal overtime practices by IBM.

*See* 29 U.S.C. § 215; *Crumpacker v. Kansas Dep't of Human Resources*, 338

F.3d 1163, 1171 (10th Cir. 2003) (holding that a plaintiff may not maintain a

retaliation claim based on an unreasonable belief that the underlying conduct

violates the law).  Saville's summary of the facts in his argument section

purportedly showing protected activity is largely unsupported by any citation to

the record.  *See* **Opening Brief at 24-30**.  Furthermore, as demonstrated below,

43

most of the facts concerning Saville's alleged protected activity that he relies on in the argument section of his brief bear no relation to the facts contained in his fact section.

In late 1997, Ms. Fullmer introduced the directive to her team to try to limit overtime whenever possible and set a target limit of 10 percent of overtime per month. Rather than accepting responsibility for managing overtime, however, Saville became defensive and sent Ms. Fullmer a number of e-mails arguing the validity of his excessive overtime. *See, e.g.*, **Aplee. Supp. App. at 199** [Dep. Ex. 9], **204** [Dep. Ex. 14] & **206** [Dep. Ex. 15]. Ms. Fullmer consistently responded with instructions to Saville to record his time "correctly and as accurately and timely as possible" and never changed that instruction. **Aplt. App. at 77** [281:2-14]; **Aplee. Supp. App. at 206** [Ex. 15]; *see also* **Aplt. App. at 67** [190:15-22] (acknowledging that Saville understood that "anytime you're on the job with IBM, you're supposed to report . . . your time. . . . And when you report your time, you get paid."). Moreover, Saville was paid for all overtime that he reported. **Aplt. App. at 64** [179:13-15].

As the foregoing facts show, Saville did not complain about illegal overtime practices to Ms. Fullmer (*i.e.*, he did not tell her that he thought IBM was violating the law). Instead, he was merely attempting to justify why he should have been allowed to work more overtime, in spite of IBM's lawful

directive.  This does not constitute protected activity, as he apparently concedes.
**Opening Brief at 27** ("Mr. Saville also does not dispute IBM's freedom to try and manage the amount of overtime he (or anybody else) was working.").  *See also* **Aplt. App. at 223** (admitting that Saville did not express complaints about alleged overtime violations to Ms. Fullmer); **Aplt App. at 145** [¶ 27].

The only other alleged protected activity that Saville has pointed to was concerns that he raised with Mr. Myers and Ms. Pye that his peers were working but not recording overtime—*i.e.*, violating company policy.  In his Opening Brief, Saville embellishes on what he told Mr. Myers and Ms. Pye, contending that he complained to them "about how the IBM Northern Utah office policies and practices regarding overtime were requiring Mr. Saville and his peers to work overtime for free—generating a culture of evading the overtime laws and regulations."  **Opening Brief at 29**.  In fact, however, the record only supports that Saville told Ms. Pye and Mr. Myers that his peers were grumbling about working but not recording overtime, with no further elaboration or detail.  *See* **Aplt. App. at 101** [485:6-12] & **106-107** [510:13-511:5].[13]  As such, Saville's

---

[13] Saville also claims (**Opening Brief at 28-29**) that he "began raising concerns" and "was complaining" about various overtime matters to Ms. Fullmer and Mr. Myers, citing 44 pages of his deposition found at pages 61, 65-72, 75 and 96 of the Appellate Record.  This testimony does not, however, demonstrate any "raising [of] concerns" or "complaining."

complaints to Ms. Pye and Mr. Myers were not specifically complaints about FLSA violations.

To constitute protected activity, Saville must have been advocating statutory rights: "[I]t is the assertion of statutory rights (*i.e.*, the *advocacy* of rights) by taking some action adverse to the company – whether via formal complaint, providing testimony in an FLSA proceeding, complaining to superiors about inadequate pay, or otherwise – that is the hallmark of protected activity under § 215(a)(3)." *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486 (10th Cir. 1996) (emphasis in original). As the district court correctly held, Saville never proffered evidence that he was complaining that IBM was violating the FLSA and advocating his or his peers' rights to overtime.

The Tenth Circuit has rejected retaliation claims where, as here, an employee does not directly assert that the employer is violating the law. *See Petersen v. Utah Dept's of Corrections*, 301 F.3d 1182, 1188 (10th Cir. 2002) (rejecting Title VII retaliation claim where plaintiff complained that her supervisor was acting "unfairly" with respect to a subordinate's performance review, but did not complain that she believed he was acting because of racial animus). Saville did not specifically complain that he believed IBM was violating the FLSA. He merely pointed out to Mr. Myers and Ms. Pye that his peers were working, but not recording, overtime—in his words, he was

46

"warning the company about possible exposure." **Opening Brief at 30**. This could only constitute a report about a FSLA violation if Saville had also complained, reasonably and in good faith, that IBM was aware of these alleged activities but was turning a blind eye. *See Whitaker v. Pacific Enterprises Oil Co.*, No. 91-5093, 1992 U.S. App. LEXIS 5135, at *3 (10th Cir. 1992) (affirming summary judgment in favor of employer on FLSA claim, because plaintiff failed to prove that employer knew or should have known of plaintiff's overtime work) (unpublished; copy attached, **Aplee. Supp. App. 322**); *see also Robertson v. Board of County Comm'rs*, 78 F. Supp. 2d 1142, 1160 (D. Colo. 1999) (holding that "where the acts of an employee prevent an employer from acquiring knowledge . . . of alleged uncompensated overtime hours, the employer cannot be said to have suffered or permitted the employee to work in violation" of the FLSA); *Reich v. Stewart*, 121 F.3d 400, 407 (8th Cir. 1997) (holding that employer does not violate the FLSA where employees are self-under-reporting overtime unless employer has knowledge of same); *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981) (holding that "where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer . . . the employer's failure to pay for the overtime hours is not a violation of § 207"). Because his complaints to Ms. Pye and Mr. Myers about employee grumbling did not put them on notice

47

that he was raising complaints about FLSA violations, they did not constitute

protected activity.[14]

In summary, Saville has at most shown that he bristled at Ms. Fullmer's

admittedly lawful instructions that he needed to control the amount of overtime

he worked and then raised concerns to Ms. Pye and Mr. Myers that his peers

might not be recording overtime that they worked—*i.e.*, that they were violating

IBM company policy.  Accordingly, Saville has not demonstrated that he raised

complaints about any alleged illegal overtime practices by IBM or was

otherwise asserting rights under the FLSA.

> **4.    Even If He Had Evidence To Make Out A Prima Facie Case, Saville's Retaliation Claim Fails As A Matter Of Law Because He Proffered No Evidence Showing That IBM's Reasons For Placing Him On A Performance Improvement Plan Were Pretextual.**

Once an employee establishes a *prima facie* case, the burden shifts to the

employer to proffer a legitimate non-retaliatory reason for its actions.  *Conner v.

Schnuck Markets, Inc.*, 121 F.3d at 1395.  The employee then has the burden of

showing pretext.  *Id.*

---

[14] Saville also states that he "was concerned that employees on travel status, including himself, were fearful about recording such time away from home on company business as work time because it might spill over into overtime hours, and were, therefore, not recording such time."  **Opening Brief at 28**.  Saville has, however, provided no citation to the record for this alleged fact or that he ever asserted this to Ms. Fullmer.

#1108762 v1

### a.     *IBM demonstrated legitimate non-discriminatory reasons.*

IBM's burden to proffer a legitimate non-retaliatory reason is not a high

burden and only requires IBM to produce some evidence "that would dispel the

inference of retaliation by establishing the existence of legitimate reason." *Id.*

(quotation omitted).  IBM had legitimate non-retaliatory reasons for taking the

action that Saville complains was adverse.  Specifically, Saville's job required

him to interact positively with customers and peers to ensure customer

satisfaction and to allow him to mentor the less experienced CEs in his group.

Ms. Fullmer was legitimately concerned that Saville was failing in these duties,

because of his attitude problems.  She received reports from peers and customers

that Saville's communication style was preventing peers from seeking

mentoring from Saville and was alienating customers, to the point where

customers requested that Saville be removed from work on their accounts.

Furthermore, Ms. Fullmer believed that Saville was inappropriately challenging

her authority in group meetings and denigrating her and other IBM management.

In his Opening Brief, Saville does not challenge that IBM met its burden

of articulating legitimate non-retaliatory reasons for its employment actions.

*See* **Opening Brief at 4, ¶ 5 & 46**.  Because Saville has not raised this issue on

appeal, it is deemed abandoned.  *See Jacklovich v. Simmons*, 392 F.3d 420, 425

n.5 (10th Cir. 2004); *Gaines-Tabb v. ICI Explosives, USA*, 160 F.3d 613, 624

49

(10th Cir. 1998) (holding that arguments not set forth fully in the opening brief are waived).  In any event, IBM cited ample authority in its summary judgment brief demonstrating that it had articulated legitimate non-discriminatory reasons for Ms. Fullmer's adverse employment action.  *See* **Aplee. Supp. App. at 29-30**.

**b.      *Saville failed to present any evidence of pretext.***

Because IBM proffered legitimate non-retaliatory reasons for Ms. Fullmer's actions, the burden shifts to Saville to demonstrate pretext, which he failed to do.  To show pretext, Saville must present competent evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [IBM's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that [IBM] did not act for the asserted non-[retaliatory] reasons." *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1080 (10th Cir. 1999). "[T]he 'relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs.'" *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004) (quoting *Bullington v. United Air Lines*, 186 F.3d 1301, 1318 (10th Cir. 1999)). The court's role is never to "second guess an employer's business judgment." *Id.*  "'The pertinent question in determining pretext is not whether the employer was right to think the employee engaged in misconduct, but whether that belief

was genuine or pretextual.'" *Tran v. Trustees of the State Colleges in Colo.*, 355 F.3d at 1270.

Here, it is undisputed that Saville's job required him to interact positively with customers and peers.  It is also undisputed that Ms. Fullmer was legitimately concerned that Saville was failing in these duties, because of his attitude problems, and was inappropriately challenging her authority in group meetings.  *See Anderson v. Stauffer Chemical Co.*, 965 F.2d 397, 402 (7th Cir. 1992) (holding no pretext was shown where plaintiff's manager acted on the basis of complaints received from plaintiff's subordinates and customers and which manager honestly believed).  There is no evidence in the record that Ms. Fullmer's stated reasons for her decisions to lower Saville's performance rating on an interim basis[15] and, when that did not work, to place him on a performance improvement plan were based on anything other than Saville's repeated failure to meet his job requirements.  Saville's attempts to attack her reasons fail.

---

[15] Saville does not contend that Ms. Fullmer's decision to give him an interim PBC was an adverse employment action, nor could he as he introduced no evidence showing that it materially affected the terms and conditions of his employment.  *See, e.g., Stover v. Martinez*, 382 F.3d at 1075 (holding that simply because an employee receives an evaluation lower than previous evaluations does not show adverse employment action, which the employee must demonstrate).  Nevertheless, the interim PBC is an important fact to consider for purposes of the pretext analysis.  Ms. Fullmer's decision to give him an interim PBC preceded any arguably protected activity, thus negating any retaliatory motive on her part, and foreshadowed her decision to place Saville on a performance improvement plan due to his continuing problems with customer and peer relations.

51

Saville first contends that pretext is shown by the fact that Ms. Fullmer treated him favorably with a merit increase and encouraged him to apply for a promotion several months before she gave him an interim PBC, lowering his performance rating, in July 1998. **Opening Brief at 47**. Saville has waived this argument because he never made it in the district court. *Shoels v. Klebold*, 375 F.3d at 1062 (holding that to preserve an issue for appeal, a party must present the legal basis of the claim to the district court clearly and explicitly). Moreover, Ms. Fullmer explained that, although she was hoping Saville would improve in his peer and customer relations, she received peer and customer complaints about Saville that caused her to issue the interim PBC. **Aplt. App. at 142** [¶¶ 13-16]. It is undisputed that customers, first Orem City and then Weider Foods, complained about Saville's inappropriate rude treatment and asked him to be removed from their accounts. *Id.* It is also undisputed that his peers complained that he was unapproachable and made them feel stupid, had a negative attitude and did not show leadership. *Id.* Thus, the change in Ms. Fullmer's treatment toward Saville was fully justified by the performance issues that arose after his raise and encouragement and does not show pretext. *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 717-18 (2d Cir. 1994) (rejecting inference of discrimination or pretext from negative performance review after prior positive reviews); *Aquilino v. Univ. of Kan.*, 83 F. Supp. 2d 1248, 1256 (D.

#1108762 v1

Kan. 2000) ("A change in management's evaluation of employee performance . . . does not by itself raise an inference of pretext").[16]

Saville next contends that his negative attitude was just a product of Ms. Fullmer's misperception of his "articulate" sharing of his concerns and that she "may have been intimidated by [his] knowledge and experience." **Opening Brief at 48**. However, "it is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of [his] own relative performance." *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1209 (10th Cir. 1999). Saville has no evidence to show that Ms. Fullmer did not honestly and in good faith perceive that Saville had a negative attitude.

Saville also attempts to show pretext by contending that "IBM proffered no evidence that [it] took action against Mr. Saville's coworkers who were having meetings 'bashing' management." **Opening Brief at 48**. Although disparate treatment might reveal pretext under appropriate circumstances, it was Saville's burden to show disparate treatment, not IBM's to prove consistent treatment. *See Jones v. Denver Post Corp.*, 203 F.3d 748, 752-753 (10th Cir. 2000) (holding that the plaintiff bears the burden of demonstrating pretext

---

[16] Additionally, it was not until after Ms. Fullmer gave Saville the PBC lowering his performance that he first mentioned (to Ms. Pye and then to Mr. Myers, but not to Ms. Fulmer) that his peers were grumbling about working but not reporting overtime. Thus, Ms. Fulmer could not possibly have had a retaliatory motive in giving Saville an interim PBC.

#1108762 v1

including proof of disparate treatment).  Saville introduced no evidence that his coworkers acted inappropriately in meetings conducted by Ms. Fullmer, or received complaints about their treatment of coworkers and customers, yet were not subjected to interim PBCs and/or performance improvement plans by Ms. Fullmer.  Thus, there is no evidence that Saville was subjected to disparate treatment.

Saville next tries to show pretext by blaming the customer complaints on the customers themselves and on Ms. Fullmer's alleged misinterpretation of those complaints.  **Opening Brief at 49-50**.  Again, he has no evidence to contradict Ms. Fullmer's testimony that she honestly believed Saville was failing in his customer relations when first Orem City and then Weider Foods asked that he be removed from their accounts.  Saville is merely attempting to substitute his own subjective evaluation of his performance for Ms. Fullmer's perception.  *See* **Aplt. App. at 111, 112** [531:6-25, 533:14-25, 535:9-17] (admitting that Saville has no foundation for his beliefs regarding reasons for removal from Weider Foods).  As there are no facts calling into question that Ms. Fullmer, due to the complaints she received, honestly and in good faith

believed that Saville was creating problems with customers, he has not shown

pretext.[17]

Saville finally attempts to explain away the problems that he had

interacting with peers on how IBM structured his job.  **Opening Brief at 51-52**.

The facts, however, must be examined "as they appeared to the person making

the [employment] decision."  *Salguero v. City of Clovis*, 366 F.3d 1168, 1176

(10th Cir. 2004).  Saville has offered no facts casting doubt on Ms. Fullmer's

assessment that the complaints from Saville's peers reflected real concerns with

his peer interaction that needed to be addressed.[18]

_____

[17] Saville also asserts, for the first time on appeal, that Ms. Fullmer overreacted and deviated from ordinary IBM protocol in how she reacted to the Orem City and Weider Foods customer complaints.  The Court should disregard this contention both because Saville never raised it with the district court and because he proffered no evidence, here or in the district court, as to the "normal" IBM procedure for dealing with customer complaints.  Absent evidence of the normal procedure, it is impossible to determine whether Ms. Fullmer deviated from it.

[18] Although he did not do so in his Opening Brief, Saville contended in his summary judgment response brief that Ms. Fullmer's testimony about customer and peer complaints was inadmissible hearsay.  In anticipation that he raises this argument again in his reply brief, IBM addresses this issue.  To meet its burden, IBM does not have to introduce affidavits from peers or customers who complained.  Ms. Fullmer's testimony concerning the complaints is proper evidence.  The complaints are not introduced as substantive evidence that Saville engaged in the misconduct that the complaining parties said he did, but to explain Ms. Fullmer's state of mind when she made the alleged adverse decisions regarding Saville, which is "a factor of crucial importance in wrongful discharge cases."  *Hardie v. Cotter & Co.*, 849 F.2d 1097, 1101 (8th Cir. 1988) (holding that supervisor's testimony about customer complaints was properly considered).  Thus, the complaints are not hearsay and are fully admissible to explain IBM's legitimate non-discriminatory reasons for placing Saville on the improvement plan.  *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434 (10th Cir. 1993); *see also Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 346 (1st

55

In the end, Saville has nothing more than "conjecture that [IBM's] explanation is a pretext, [which] is an insufficient basis for denial of summary judgment." *Beams v. Norton*, 256 F. Supp. 2d 1203, 1215 (D. Kan. 2003), *aff'd* 2004 U.S. App. LEXIS 5728 (2004). Accordingly, IBM is entitled to judgment as a matter of law in its favor on his FLSA retaliation claim.

## V.    CONCLUSION

For all of the foregoing reasons, IBM respectfully prays for the entry of a judgment (a) affirming the district court's summary judgment in favor of IBM, (b) taxing costs against Saville, and (c) granting IBM such other and further relief as the Court deems appropriate.

Respectfully submitted this 16th day of September, 2005.

> HOLME ROBERTS & OWEN LLP
>   Martin D. Litt, #23716
>   Sven C. Collins, #27040
>
>   /s/  Martin D. Litt
>  1700 Lincoln Street, Suite 4100
>  Denver, Colorado  80203-4541
>   (303) 861-7000
>  Martin.Litt@hro.com
>  Attorneys for Defendant-Appellee IBM Corp.

---

Cir. 1998) ("[A] customer complaint offered to show, for example, that a decision maker had notice of the complaint, rather than to prove the specific misconduct alleged in the complaint, is not barred by the hearsay rule."). Furthermore, IBM did introduce a declaration from the representative of customer Orem City who complained that Saville acted obnoxiously and rude to the customer and requested his removal from the customer's account. Aplt. App. at 205-206 ¶3.

## <u>ATTACHMENTS</u>

1.    District Court's Judgment in a Civil Case, Dated April 15, 2005

2.    District Court's Amended Judgment in a Civil Case, Dated April 22, 2005

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because it contains 13,854 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

_____ s/ Sven C. Collins _____

Dated:  September 16, 2005

## **CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that any and all required privacy redactions have been made and, with the exception of any such redactions, the documents submitted in digital form are exact copies of the written documents filed with the Clerk, and said documents have been scanned for viruses with the most recent version of a commercial virus scanning program (Trend Micro Office Scan 6.5 – 9/15/2005) and according to the program are free of viruses.

/s/  Pamela Goertz

_____

## **CERTIFICATE OF FILING AND SERVICE**

The undersigned hereby certifies that on this 16th day of September, 2005, and pursuant to Fed. R. App. P. 25(a)(2)(B), the original and at least seven (7) copies of the foregoing **APPELLEE'S ANSWER BRIEF,** together with a cd-rom containing an exact electronic version were hand-delivered to the Clerk of the United States Court of Appeals for the Tenth Circuit; as well as another copy together with a cd-rom containing an exact electronic version deposited in the mail and addressed as follows:

David J. Holdsworth
9125 So. Monroe Plaza Way, Suite C
Sandy, UT  84070

/s/  Pamela Goertz

_____

#1108762 v1

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

| | | |
|---|---|---|
| MICHAEL SAVILLE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | 10th Circuit No. 05-4058 |
| | ) | |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

On Appeal from the United States District Court
for the District of Utah

The Honorable Dee Benson
United States District Judge
District Court Civil Action No. 2:00CV00681DB

**APPELLEE'S SUPPLEMENTAL APPENDIX**

**ORAL ARGUMENT
NOT REQUESTED**

HOLME ROBERTS & OWEN LLP
Martin D. Litt, #23716
Sven C. Collins, #27040
1700 Lincoln Street, Suite 4100
Denver, Colorado  80203-4541
Telephone:  (303) 861-7000
Martin.Litt@hro.com

Attorneys for Defendant-Appellee
International Business Machines
Corporation

**Attachments Included Only in Writing and
Not in Digital or Scanned PDF Format**

#1112765 v1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 16, 2005, a true and correct copies of the foregoing **APPELLEE'S SUPPLEMENTAL APPENDIX** were sent to the following persons in the manner indicated below:

| | |
|---|---|
| XX | by hand-delivery (two hard copies), along with digital submission of index to Appellee's Supplemental Appendix (in PDF format) to the address and email addressees listed below: |

| | |
|---|---|
| Clerk<br>United States Court of Appeals, 10th Cir.<br>1823 Stout Street<br>Denver, CO  80257<br><br>Email: ESubmission@ca10.uscourts.gov | |

*hard copies of Appellee's Supplemental Appendix, along with index to appendix in digital form on CD, sent via first class mail, postage prepaid to:*

David J. Holdsworth, Esq.
9125 South Monroe Plaza Way
Suite C
Sandy, UT  84070

All required privacy redactions have been made to said document, with the exception of those redactions, every document submitted in digital form is an exact copy of the written document filed with the clerk, and said document has been scanned for viruses with the most recent version of a commercial virus scanning program Trend Micro OfficeScan 6.5, 9/15/2005 and according to the program are free of viruses.

/s Pamela Goertz

_____
Pamela Goertz

1

**SAVILLE v. IBM**
**APPELLEE'S SUPPLEMENTAL APPENDIX**
**INDEX OF DOCUMENTS**

**DOCUMENT**                                                                  **PAGES**

1.  Pages from Oral Argument on Motion for Summary Judgment
      inadvertently omitted from Appellant's Appendix                         SA01-SA05

2.  Memorandum in Support of Defendant's Motion
      for Summary Judgment                                                    SA06-SA32

3.  Plaintiff's Memorandum in Opposition to Defendant's
      Motion for Summary Judgment                                            SA33-SA77

4.  Reply Brief in Support of Defendant's Motion for
      Summary Judgment                                                        SA78-SA99

5.  Defendant's Errata Sheet In Support of Summary Judgment                   SA100-SA102

6.  Summary Judgment Exhibit A—Saville Deposition Transcript                  SA103-SA150

7.  Summary Judgment Exhibit B—Declaration of Vickie Fullmer                  SA151-SA158

8.  Summary Judgment Exhibit C—Declaration of Brian T. Myers                  SA159-SA162

9.  Summary Judgment Exhibit D— (Saville Dep. Exhibit 8)                      SA163-SA165

10. Summary Judgment Exhibit E—(Saville Dep. Exhibit 3)                       SA166-SA173

11. Summary Judgment Exhibit F—(Saville Dep. Exhibit 4)                       SA174-SA179

12. Summary Judgment Exhibit G—(Saville Dep. Exhibit 7)                       SA180-SA181

13. Summary Judgment Exhibit H                                                SA182-SA183

14. Summary Judgment Exhibit I                                                SA184-SA189

15. Summary Judgment Exhibit J                                                SA190-SA191

16. Summary Judgment Exhibit K—(Saville Dep. Exhibit 25)                      SA192-SA193

17. Summary Judgment Exhibit L                                                SA194

18. Summary Judgment Exhibit M—(Saville Dep. Exhibit 27)                      SA195-SA197

#1112765 v1

19.    Summary Judgment Exhibit N—(Saville Dep. Exhibit 36)        SA198

20.    Summary Judgment Exhibit O—(Saville Dep. Exhibit 9)         SA199-SA203

21.    Summary Judgment Exhibit P—(Saville Dep. Exhibit 14)        SA204-SA205

22.    Summary Judgment Exhibit Q—(Saville Dep. Exhibit 15)        SA206-SA207

23.    Unpublished Authorities submitted with IBM's Memorandum
         in Support of Summary Judgment                            SA208-SA269

24.    Summary Judgment Exhibit R—Excerpts from Deposition
         Transcript of Michael Saville                             SA270-SA304

25.    Summary Judgment Exhibit S—Second Declaration
         of Vicki Fullmer                                          SA305-SA309

26.    Unpublished Authorities submitted with IBM's
         Reply Brief in Support of Summary Judgment                SA310-SA323

27.    Order and Judgment, United States Court of Appeals,
         10th Circuit, dated March 29, 2005 (Case No. 03-4172)   SA324-SA327

28.    Judgment in a Civil Case, dated April 15, 2005              SA328-SA329

29.    Amended Judgment in a Civil Case, dated April 22, 2005      SA330-SA331

#1112765 v1

HOLME ROBERTS & OWEN LLP
Elizabeth T. Dunning #3896
Martin D. Litt (Pro Hac Vice)
Sven C. Collins (Pro Hac Vice)
299 South Main Street, Suite 1800
Salt Lake City, Utah  84111-2263
Telephone:   (801) 521-5800
Facsimile:    (801) 521-9639
Attorneys for Defendant International Business Machines Corporation

<table>
<tr><td colspan="2" align="center">IN THE UNITED STATES JUDICIAL DISTRICT COURT<br>FOR THE DISTRICT OF UTAH, CENTRAL DIVISION</td></tr>
</table>

| | |
|---|---|
| MICHAEL SAVILLE,<br><br>                    Plaintiff,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York Corporation,<br><br>                  Defendant. | **MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:00CV00681B |

Defendant International Business Machines Corporation ("IBM"), by its counsel,

respectfully submits this Memorandum in Support of IBM's Motion for Summary Judgment.

For the reasons stated below, the Court should grant IBM's Motion and enter judgment in favor

of IBM on plaintiff Michael Saville's ("Saville") sole claim for relief for retaliation under the

Fair Labor Standards Act, 29 U.S.C. § 215 ("FLSA").

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................2

II. STATEMENT OF UNDISPUTED FACTS ..........................................3

    A.   **Saville held a senior-level position with IBM requiring strong mentoring, teamwork, and customer service skills**...........................................3

    B.   **Saville's job performance, particularly in the area of customer and peer relations, declined and his attitude became increasingly negative during his final years with IBM prior to retirement** ................................5

    C.   **Ms. Fullmer gave Saville an interim PBC lowering his performance rating in an effort to improve his performance**..........................8

    D.   **Saville complained about his interim PBC to Human Resources and to Ms. Fullmer's supervisor, Brian Myers** ..................................9

    E.   **Having seen continued problems with Saville's performance, Ms. Fullmer decided to give him a choice to go on an improvement plan or separate from the company with severance** ...................................11

    F.   **Saville rejected the a choice of going on an improvement plan and instead voluntarily retired from IBM**.........................................12

    G.   **Saville never complained about any allegedly illegal overtime practices to Ms. Fullmer and she acted solely because of his unacceptable performance** ...................13

III. ARGUMENT .................................................................................15

    A.   **Saville's claim for FLSA retaliation fails as a matter of law because he cannot make out a *prima facie* case**..............................15

    B.   **Even if he could make out a *prima facie* case, Saville's retaliation claim fails as a matter of law because there is no evidence that IBM's reasons for placing him on a performance improvement plan were pretextual** ........................22

IV. CONCLUSION ...............................................................................25

## I.  INTRODUCTION

Saville worked for IBM as a senior customer engineer, a job which required him to maintain positive relations both with the customers to whose accounts he was assigned and with his less experienced peers whom he was to mentor and train.  Faced with repeated complaints from Saville's peers that they did not feel comfortable approaching him for advice or training and from customers who were alienated due to his rude and adversarial communications style, and having already counseled Saville that his performance was unacceptable in these key areas, Saville's manager, Vickie Fullmer, decided to place him on a performance improvement plan. Rather than accepting ownership for his performance problems and taking the opportunity offered by Ms. Fullmer to remedy those problems, Saville decided to retire from IBM in October 1998.

Saville claims that Ms. Fullmer and IBM forced him to retire in retaliation for complaints he made about alleged overtime violations.  This claim is unfounded and should be dismissed as a matter of law for several reasons.  First, Saville cannot make a *prima facie* case because he can neither show protected activity, adverse employment action, nor a causal connection between any alleged adverse acts and his alleged protected activity.

As to the first element, the only complaints that Saville made about overtime were in the form of resistance to his manager's directives to reduce the amount of overtime worked.  Saville agrees, however, that these efforts were lawful, that he never complained that IBM failed to pay him overtime, and that he was always paid for overtime.  Therefore, Saville's complaints do not qualify as protected activity.

There is also no proof of adverse employment action. Although Saville contends that he was constructively discharged, the undisputed facts show that he retired, for his own reasons, and not because of intolerable working conditions. Furthermore, there is no evidence of a causal connection because the decision maker, Ms. Fullmer, did not know that Saville had engaged in any alleged protected activity until after he had already retired from IBM.

Second, even if Saville could present a *prima facie* case, IBM had legitimate nondiscriminatory reasons for its actions. Ms. Fullmer received repeated reports from Saville's peers and customers that his adversarial communications style was alienating his peers and IBM's customers to the point where certain of them did not want to work with him. Even though Ms. Fullmer confronted Saville with these problems, she continued to receive the same types of complaints. Furthermore, Saville inappropriately challenged Ms. Fullmer's authority in group meetings and denigrated her and other IBM management to his peers. The undisputed facts show that Ms. Fullmer was motivated solely by these serious and repeated performance issues in deciding to place Saville on a performance improvement plan. Accordingly, IBM is entitled to summary judgment in its favor on Saville's sole claim for FLSA retaliation.

## II.  STATEMENT OF UNDISPUTED FACTS

### A.  <u>Saville held a senior-level position with IBM requiring strong mentoring, teamwork, and customer service skills.</u>

1.     Saville was employed with IBM from 1966 until his retirement on October 30, 1998. **Saville Dep., attached as Ex. A, at 10:7-11; 631:22-632:8**. From 1996 through 1998, he was an Account Systems Services Representative also known as a Customer Engineer ("CE"). **Complaint ¶ 10**. IBM had different levels (known as "Bands") of CEs based on an employee's

level of experience and responsibility.  **Declaration of Vickie Fullmer, attached as Ex. B, at ¶ 3**.  Saville was a Band 5 CE, the second highest level and the most senior in his group.  *Id*.

2.      As a CE, Saville was responsible for maintaining IBM equipment at customer locations, serving as a technical resource for customers, managing customer accounts in a cost-efficient manner, and influencing customers to purchase additional IBM products and services.  **Ex. A at 366:18 – 367:8, 368:13-18; Ex. B ¶ 4; Dep. Ex. 8, attached as Ex. D**.  There were three general functions to Saville's job.  First, there was the technical function of being able to install and maintain IBM equipment for customers.  Saville had the skills and technological knowledge necessary for the job.  **Ex. B ¶ 4**.

3.      The second key aspect of the CE job was "developing positive relationships with customer management and staff to ensure a high level of overall customer satisfaction in all assigned accounts."  **Ex. B ¶ 5; Ex. D at p.1**.  In essence, CEs had to relate well with customers so the customers would continue to buy IBM's products and services.

4.      The third key part of Saville's senior-level CE position was mentoring and training the less experienced CEs in the group.  **Ex. A at 83:23 – 84:10; Ex. B ¶ 6**.  It was important that he develop and maintain good working relationships with his peers so that they would feel comfortable coming to him to draw upon his valuable knowledge and skills.  **Ex. B ¶ 6**.  He received higher pay as a senior CE, in part, with the expectation that he would mentor and train.  *Id*.

5.      Good interpersonal skills, for customer and peer relations, were essential to Saville's job performance.  **Ex. B. ¶ 7**.  Saville was to "establish and maintain positive work

4

relationships with peers, management, and customers[,] displaying willingness to understand diverse points of view." **Ex. B ¶ 7; Ex. D at p.3**.

6.    Furthermore, Saville was required to manage his customer accounts in a cost-efficient manner, which included managing his time and expenses efficiently. **Ex. A at 177:24 – 178:8, 180:2-5; Ex. B. ¶ 8**.

**B.    Saville's job performance, particularly in the area of customer and peer relations, declined and his attitude became increasingly negative during his final years with IBM prior to retirement.**

*Starting in 1995, managers noted problems with Saville's interactions with peers and customers.*

7.    As early as 1995, Saville's managers began to note problems with the manner in which he interacted with others. In Saville's annual performance review (known as a "Personal Business Commitment" or "PBC") for 1995, his manager at the time stated:

> [M]ore is expected in his relationships and the way he communicates with others. This has lead [sic] some people to not want to use him in his specialist capacity or as a peer. Mike at times comes across as comes across [sic] negative and adversarial causing some people to not want to deal with him.

**Ex. A at 99:21 – 100:25 & Dep. Ex. 3, attached as Ex. E, at IBM0006**. He received the lowest of three possible ratings, "More is expected." *Id*.

8.    Saville's problems in mentoring and relating to his peers continued in 1996, as reflected in his 1996 PBC:

> Mike . . . has a hard time to mentor others because a lot of them prefers [sic] not to work with him. . . . Mike should continue to work on his relationships with his peers.

**Dep. Ex. 4, attached as Ex. F, at IBM000750; Ex. A at 103:17 – 104:3**.[1]  Saville admitted, in

relation to the 1996 PBC, that there were two individuals in his work group who had chosen not

to work with him.  **Ex. A at 116:6-14**.

      9.     Vickie Fullmer was Saville's supervisor from approximately January 1997

through the approximate year and a half of his employment prior to retirement.  **Ex. B ¶ 2**.

      10.    When she took over as Saville's supervisor, Ms. Fullmer was generally aware of

Saville's history of problems with his interpersonal relations.  **Ex. B ¶ 9**.  Nonetheless, she gave

him a clean slate, hoping that he would correct these problems.  ***Id.***

      11.    During her first year supervising Saville, he performed well technically, but had

problems with his peer relationships.  **Ex. B ¶ 10**.  Several of the CEs who worked with Saville

complained to Ms. Fullmer that they were uncomfortable asking him for technical assistance

because he would often handle the situation in a demoralizing manner.  He would talk down to

them. ***Id***.

      12.    Ms. Fullmer met with Saville and told him that his peers' perception was that,

although he had strong technical skills, he was not easily approachable.  She explained that as his

job required him to be a resource and a mentor, he would need to improve this aspect of his

performance.  ***Id***.  For example, in a November 1997 e-mail to him she stated:

> Mike, you are a very talented SSR.  Don't loose [sic] sight of that.  <u>We need to</u>
> <u>keep working on your interactions with others and the perception that has been</u>
> <u>created over the years.  I continue to support you and take your name forward in a</u>
> <u>very positive light.  I'm doing everything I can to try to help you create a new</u>
> <u>impression on the team</u> . . . . Please trust me to do the best I can and to have the
> skills, knowledge and experience to handle a few things.

---

[1] At Saville's request, his 1996 PBC was not placed in his personnel file.  *See* **Ex. A at 115:4 – 116:5**.  Accordingly, the quoted language is Saville's documentation of his supervisor's comment.

**Dep. Ex. 7, attached as Exhibit G, at IBM 000310 (emphasis added)**.

13.    As part of the annual PBC (performance review) process, IBM solicited

comments from each employee's peers. **Ex. A at 385:18-21; Ex. B ¶ 11**. This was known as

"360 Degree Feedback." ***Id***. In the 360 Degree Feedback rating of Saville's 1997 performance,

his peers made the following comments reflecting Saville's poor relations with them and with

customers:

> I know Mike is trying harder to have better "bedside manners" and I think he
> will accomplish the task. His customer relations is [sic] sometimes strained
> because of what he says. Mike has this problem with his peers too. . . .
>
> A possible point for improvement might be for Mike to be a little less forceful
> when working with customers when he tries to have them understand his
> approach with certain projects . . . .
>
> Mike works to [sic] many hours and it makes him grouchy.

**360 Degree Feedback, attached as Ex. H; Ex. B ¶ 11**.

14.    Even though Saville needed further improvement in his team building, customer

relations, mentoring and interpersonal skills, Ms. Fullmer rated him as having "Achieved

Commitments" on his 1997 PBC, because she had seen some improvement in these areas and he

had valuable technical abilities. **Ex. B ¶ 12**. Ms. Fullmer also thought that Saville seemed to be

acknowledging his problems, stating that he was "a bit cranky according to [his] peers," that he

would "work on it," and that he had "no problem changing and underst[ood] the importance."

**Ex. I at IBM 000647**. In the 1997 PBC, Ms. Fullmer praised Saville for the efforts he had made,

and stressed that he needed to continue to work on his relationship skills, hoping that this would

encourage Saville to correct his performance deficiencies. **Ex. B ¶ 12**. Ms. Fullmer specified in

the 1997 PBC that "Committment [sic] and long term results will assist in overcoming some of the remaining barriers."  **Ex. I at IBM 00648**.

### *Saville's performance problems continued and his attitude became worse during his final 10 months of work.*

15.     Saville's performance problems in the key areas of his interpersonal relations and mentoring unfortunately did not improve in 1998, as Ms. Fullmer had hoped.  **Ex. B ¶ 13**.

16.     Saville's attitude seemed to have soured.  In department meetings, he would make negative comments about IBM and his department.  **Ex. B ¶ 14**.  Saville admits that he was negative.  **Ex. A at 431:4-13, 432:3-6**.

17.     Saville's customer relations were also a cause for concern.  In June 1998, one of IBM's customers, Orem City, requested that Saville be taken off the account because of his poor interpersonal skills.  The customer representative told Ms. Fullmer that Saville would belittle the customer's system operators and programmers who were working on the project.  **Ex. B ¶ 15**; **Ex. A at 491:8-16, 494:25 – 495:7; Dep. Ex. 28 attached as Ex. J**.

18.     Ms. Fullmer also continued to hear complaints from Saville's peers that they found him difficult to work with and unapproachable because he made them feel stupid, that he had a negative attitude, and that he did not display leadership.  **Ex. B ¶ 16**.

**C.     Ms. Fullmer gave Saville an interim PBC lowering his performance rating in an effort to improve his performance.**

19.     Because Ms. Fullmer believed that Saville's performance was headed in the wrong direction and was unacceptable, she decided to give him an interim PBC review.  **Ex. B ¶ 17**.  An interim review is a way to tell employees that they are trending toward a low

8

performance rating with the hope that they will correct their performance before the end-of-the-year review. *Id*.

20.    Ms. Fullmer met with Saville in July 1998 to discuss his continuing performance problems and to tell him that he was being reviewed on an interim basis. **Ex. A at 383:21-23; Ex. B ¶ 18**. She told him his performance rating was headed downward and, at that time, was a whole level below what he had been rated for 1997. **Ex. A at 394:5-7; Ex. B ¶ 18**. Ms. Fullmer's assessment was based on Saville's negative attitude, lack of leadership (even though he was being paid as a leader), continued problems dealing with his peers and customers, and failure to show adequate support for Ms. Fullmer. *See* **Ex. A at 392:4 - 393:17; Ex. B ¶ 18**.

21.    The interim PBC was essentially a wakeup call that Saville needed to improve his performance before the end of the year or his rating would suffer. **Ex. B ¶ 19**.

**D.    Saville complained about his interim PBC to Human Resources and to Ms. Fullmer's supervisor, Brian Myers.**

22.    Saville did not think that his interim PBC was fair and, therefore, submitted an anonymous e-mail complaint to IBM human resources under IBM's "Speak Up" program. *See* **Ex. A at 412:9-18, 413:2-9 & Dep. Ex. 25, attached as Ex. K**.

23.    IBM's "Speak Up" program allows employees to raise issues, complaints or concerns anonymously with human resources personnel. **Declaration of Brian T. Myers, attached as Ex. C, at ¶ 3**. Saville acknowledged in his Speak Up that he had an attitude problem, saying "I think I do have an attitude problem as a result of some of my manager's action and lack of action and the meeting today certainly reinforced my attitude in a negative direction." *See* **Ex. K at IBM 00800**. Saville believed that the interim PBC was a result of

Ms. Fullmer's reaction to an allegedly negative employee survey about her effectiveness as a manager. *Id*.

24.     On July 17, 1998, Saville had a follow-up telephone conference regarding his Speak Up with an IBM Human Resources officer, Pat Pye. **Ex. A at 418:11-13**. Saville raised his concerns with Ms. Fullmer's interim PBC. **Ex. A. at 428:24 – 429:1**. Ms. Pye suggested that Saville discuss his concerns with Brian Myers, his Second Line Manager to whom Ms. Fullmer reported.[2] *See* **Ex. L**.

25.     On September 1, 1998, Saville met with Mr. Myers to discuss his concerns. **Ex. A at 474:23-24**. Saville told Mr. Myers that he thought Ms. Fullmer was not properly managing her group. *See* **Ex. M at 406; Ex. C ¶ 5**. Mr. Myers also took the occasion to express his concern that Saville reportedly had been removed from several customer accounts. **Ex. A at 484:18-21; Ex. C ¶ 6**. Saville admitted that he had been taken off the Orem City account at the customer's behest. **Ex. C ¶ 6; Ex. M at p. 407 ¶ 1**.

26.     Mr. Myers told Saville that he would investigate Saville's concerns by interviewing other members of his work group. **Ex. A at 495:8-15**.

27.     Following his September 1, 1998 meeting with Saville, Mr. Myers investigated Saville's concerns by interviewing three members of his group. He concluded that Saville's concerns were without merit and, instead, that Saville had serious communication problems with Ms. Fullmer and customer engineers. **Ex. C ¶ 7**.

---

[2] As Saville's Second Line Manager, Brian Myers was responsible for overseeing multiple territories including the area managed by Vickie Fullmer. **Ex. C ¶ 2**.

**E.      Having seen continued problems with Saville's performance, Ms. Fullmer decided to give him a choice to go on an improvement plan or separate from the company with severance.**

28.      Ms. Fullmer continued to see problems with Saville's performance following the interim PBC.  **Ex. B ¶ 20**.  For example, during a September meeting of the CEs under her supervision, Saville interrupted her and made several comments that she perceived as undermining her authority and denigrating IBM.  ***Id.***  Ms. Fullmer perceived his comments as suggesting that IBM did not value its people and that the group should look for jobs elsewhere. ***Id.***  She understood his other comments to suggest that IBM management did not know what it was doing, but that he did because he had been with the company for 32 years. ***Id.***  Saville admits he participated in management bashing sessions on other occasions.  **Ex. A at 472:2-16**

29.      Additionally, another customer to whom Saville had been assigned told Ms. Fullmer that it was dissatisfied with his service and demanded that IBM replace him with another CE.  **Ex. B ¶ 21; Ex. A at 530:15-531:25**.

30.      Ms. Fullmer decided that her softer approach was not working and that Saville needed stronger persuasion.  **Ex. B ¶ 22**.  She met with her manager, Mr. Myers, sometime in late September 1998 and explained that she was not getting results from informal efforts to improve Saville's performance.  She told him she was experiencing more and more problems with Saville and that she had, therefore, decided to put Saville on a formal performance improvement plan.  ***Id***.  Mr. Myers also suggested offering Saville the alternative option of a severance package if he were unwilling to go on the performance improvement plan.  Ms. Fullmer agreed with this approach.  ***Id***.

31.     Mr. Myers already had a meeting scheduled with Saville so he anticipated explaining the options to Saville in general terms, but expected Ms. Fullmer would provide details in a follow-up meeting.  **Ex. B ¶ 23**.

**F.     Saville rejected the choice of going on an improvement plan and instead voluntarily retired from IBM.**

32.     Mr. Myers met with Saville on September 30, 1998.  **Ex. C ¶ 10**.  Mr. Myers reported that his interviews with Ms. Saville's peers had not confirmed Saville's complaints that Ms. Fullmer was the problem.  Mr. Myers said that the interviews had instead revealed that Saville had serious performance problems.  ***Id.***  Mr. Myers told Saville that his attitude, leadership, mentoring and support for Ms. Fullmer were unacceptable and that his attitude problem was causing customer complaints.  **Ex. C ¶ 11; Ex. A at 565:19-25**.  Mr. Myers also told Saville that he was very concerned with the customer complaints.  **Ex. C ¶ 11**.  This was unacceptable from a leadership point of view.  ***Id***

33.     Saville responded, in part, by admitting that he had a negative attitude, but blamed it on how he felt he had been treated by management.  **Ex. A at 567:7-16**.

34.     Mr. Myers told Saville that his job required him to step up to his leadership role and provide the necessary mentoring to employees who were less experienced.  **Ex. C ¶ 11**.  Myers explained that Saville needed to make an effort to turn things around and that the changes had to be made now.  ***Id.***  Mr. Myers then explained that Saville would have the option of going on a performance improvement plan or leaving IBM with a severance package.  **Ex. C ¶ 12; Ex. A at 580:6-24**.  He concluded the conversation by saying that Ms. Fullmer would provide further details regarding the options.  **Ex. C ¶ 12; Ex. A at 583:8-11**.

35.     On October 5, 1998, Ms. Fullmer met with Saville and laid out his options in more detail.  **Ex. A at 586:12-14**.  She told him that he had fallen short of his job expectations and could go on a thirty-day improvement plan to correct his problems with performance, leadership, support of his peers, support of management, team work and customer satisfaction.  **Ex. A at 588:12-18, 601:20-25 Ex. B ¶ 24**.  Alternatively, Saville could immediately leave IBM and accept a severance package.  **Ex. A at 594:21-595:3**.  Ms. Fullmer told Saville that he had 30 days to decide.  **Ex. A at 601:11-40**.

36.     A performance improvement plan does not automatically result in termination.  **Ex. B ¶ 25; Ex. C ¶ 13**.  It is a real opportunity for an employee to correct deficient performance and avoid termination.  **Ex. C ¶ 13**.  In fact, Mr. Myers had experience with employees successfully completing performance improvement plans.  *Id*.

37.     Saville rejected both of the options presented by Ms. Fullmer.  **Dep. Ex. 36, attached as Ex. N**.  Instead, he chose to retire and to receive full benefits under IBM's generous Retirement Plan.  **Ex. A at 625:7-19 & Ex. N**.  Saville retired from IBM on October 30, 1998.  **Ex. A at 633:18-24.**

**G.     Saville never complained about any allegedly illegal overtime practices to Ms. Fullmer and she acted solely because of his unacceptable performance.**

38.     Saville contends that he complained twice to IBM management regarding overtime practices:  the first to Ms. Pye, during their July 17, 1998 telephone conference, and the second to Mr. Myers, during their September 1, 1998 meeting.  **Ex. A at 521:3-14, 523:17-524:12**.  Saville also claims that he told Mr. Myers that several unspecified CEs were grumbling because they were working overtime and not recording it because of the way IBM was "micromanaging" overtime.  **Ex. A at 485:6-12, 510:13-511:5**.

39.     As Saville readily admits, Ms. Fullmer had no knowledge of Saville's alleged complaints about overtime practices to Ms. Pye or to Mr. Myers, or that he had made his Speak Up complaint.  **Ex. A at 541:15-19; Ex. B ¶ 27**.  Saville testimony on this point was unequivocal:

> Q.     Did you tell Ms. Fullmer that you had complained to Ms. Pye regarding her management style with respect to overtime?
>
> A.     Ms. Fullmer didn't know that I had talked to Ms. Pye.
>
> Q.     Did you ever tell Ms. Fullmer that you had complained to Ms. Pye about her overtime practices?
>
> A.     No.
>
> Q.     Did you ever tell Ms. Fullmer that you had complained to Mr. Myers regarding her overtime practices?
>
> A.     No.
>
> . . .
>
> Q.     Did you ever tell Ms. Fullmer that you had complained to anyone above her in management regarding any of her management practices?
>
> A.     No.

**Ex. A at 541:5 – 542:12**.  Ms. Fullmer, accordingly, had no knowledge that Saville had raised any complaints about alleged illegal overtime practices before her decisions to give him an interim PBC lowering his performance rating or to place him on a performance improvement plan.  ***Id.***; **Ex. B ¶ 27**.

40.     Moreover, Ms. Fullmer's decisions to give Saville an interim PBC and then, when that did not work, to place him on a performance improvement plan were solely based on Saville's repeated failures to meet his job requirements.  **Ex. B ¶ 27**.

14

# III.  ARGUMENT

**A.** **Saville's claim for FLSA retaliation fails as a matter of law because he cannot make out a _prima facie_ case.**

Saville's sole claim is for retaliation under the FLSA.  *See* **Complaint p. 3**.  In order to prevail on this claim, he must demonstrate a *prima facie* case, which requires him to show:  (a) that he engaged in activity protected by the FLSA, (b) that he suffered adverse employment action by IBM after his protected activity, and (c) a causal connection between the protected activity and the adverse employment action.  *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1394 (10th Cir. 1997).  Saville's claim fails because he cannot show adverse employment action or that IBM was motivated by any alleged protected activity in its actions toward him.

**1.** **Saville's resistance to Ms. Fullmer's lawful directives to reduce overtime did not constitute protected activity.**

To demonstrate protected activity, Saville must show that he raised good-faith, reasonable complaints about alleged illegal overtime practices.  *See* 29 U.S.C. § 215; *Crumpacker v. Kansas Dep't of Human Resources*, 338 F.3d 1163, 1171 (10th Cir. 2003) (holding that a plaintiff may not maintain a retaliation claim based on an unreasonable belief that the underlying conduct violates the law).  Saville cannot demonstrate that he raised complaints about alleged illegal overtime practices.  At most, he can show that he bristled at Ms. Fullmer's admittedly lawful instructions that he needed to control the amount of overtime he worked.

In late 1997, IBM determined that it needed to manage more efficiently the amount of overtime worked by its employees.  **Ex. A at 122:1-24**.  As a result, Ms. Fullmer asked employees, including Saville, to try to limit overtime whenever possible and set a target limit of

10 hours of overtime per month.  *See* **Ex. A at 122:1-24, 169:13-25**.  As Saville admits, this directive was lawful.  *See* **Ex. A at 180:2-5; 276:16 – 277:8**.[3]

Rather than accepting responsibility for managing overtime, however, Saville became defensive and sent Ms. Fullmer a number of e-mails arguing the validity of his excessive overtime.  *See, e.g.,* **Dep. Ex. 9, attached as Ex. O; Dep. Ex. 14, attached as Ex. P**.  Ms. Fullmer consistently responded with instructions to Saville to record his time "correctly and as accurately and timely as possible" and never changed that instruction.  **Ex. A. at 281:2-14**; **Dep. Ex. 15, attached as Ex. P;** *see also* **Ex. A at 190:15-22** (acknowledging that Saville understood that "anytime you're on the job with IBM, you're supposed to report . . . your time. . . .  And when you report your time, you get paid.").  Moreover, Saville was paid for all overtime that he reported.  **Ex. A at 179:13-15**.

As the foregoing facts show, Saville did not complain about <u>illegal</u> overtime practices (*i.e.*, he did not tell Ms. Fullmer that he thought IBM was violating the law).  Instead, he was merely attempting to justify why he should have been allowed to work more overtime, in spite of IBM's lawful directive.  This does not constitute protected activity.

      **2.**      **IBM did not take adverse action against Saville**.

Throughout this litigation, Saville has claimed that IBM terminated his employment.  *See, e.g.*, **Complaint ¶¶ 21-22**.  However, it is undisputed that he elected to retire from IBM.  Thus, in order to demonstrate adverse employment action, Saville "bears the burden of proving

---

[3] Indeed, Saville was correct that an employer's restriction and managing of overtime is legal and does not violate the FLSA. *See Whitaker v. Pacific Enters. Oil Co.*, 1992 U.S. App. LEXIS 5135, at *4 (10th Cir. Mar. 9, 1992) (copy attached).

[he] was constructively discharged by a preponderance of credible evidence." *Hirschfeld v. New Mexico Corrections Dep't*, 916 F.2d 572, 580 (10th Cir. 1990).

"[N]ot every unhappy employee has an actionable claim of constructive discharge . . . ." *Bolden v. PRC Inc.*, 43 F.3d 545, 552 (10th Cir.), *cert. denied*, 516 U.S. 826 (1995). "Constructive discharge requires considerably more proof than establishing unpleasant working conditions." *Woodward v. City of Worland*, 977 F.2d 1392, 1402 (10th Cir. 1992), *cert. denied*, 509 U.S. 923 (1993); *see also Lighton v. University of Utah*, 209 F.3d 1213, 1222 (10th Cir. 2000) ("The question is not whether working conditions become difficult or unpleasant."). "[T]he question on which constructive discharge cases turn is simply whether the employer *by its illegal discriminatory acts* has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Ramsey v. City & County of Denver*, 907 F.2d 1004, 1010 (10th Cir. 1990) (quotation omitted); *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 858 (10th Cir. 2000). Essentially, Saville must show that his work circumstances, due to IBM's illegal discriminatory acts, became so intolerable that he had no other choice but to quit. *Woodward v. City of Worland*, 977 F.2d at 1401.

Saville had an obvious, reasonable alternative to resignation: he had the option of continuing employment under a performance improvement plan. Courts have consistently found that such options negate a finding of constructive discharge. For example, in *Hillman v. Safeco Ins. Co. of America*, the court addressed an employee's claim that he had been forced to resign when his company placed him on an improvement plan:

> When an employer presents an employee with legitimate options for continued employment that generally precludes a finding of constructive discharge. . . . Therefore, when an employer gives an employee a realistic option of improving

#767015 v10

> his or her situation, and the work environment is not otherwise unreasonably
> intolerable, the employee cannot claim that he or she was forced to retire.

190 F.Supp. 2d 1029, 1036-1037 (N.D. Ohio 2002), *aff'd*, 2003 U.S. App. LEXIS 8703 (6th Cir. May 6, 2003). The court held that "by placing [plaintiff] on a performance plan, Safeco attempted to correct the problems it perceived with [plaintiff's] performance. Even though only a small percentage of people placed on the performance plan still remain employed by Safeco, being placed on such a plan does not necessarily indicate that termination is imminent." *Id.* at 1037. Accordingly, the court held that "the option for continued employment in the performance plan preclude[d] a finding of constructive discharge." *Id.* at 1038.

The result was almost identical in *Peecook v. Northwestern Nat'l Ins. Group*, 1998 U.S. App. LEXIS 18265, at *13 (6th Cir. Aug. 3, 1998) (unpublished; copy attached). In that case, the court held that a plaintiff was not constructively discharged where he was given a choice of a 90-day performance plan with the opportunity to correct performance issues or voluntary retirement with severance (just as Saville was). *Id.* at *13. The court reasoned that, "[A] plaintiff cannot claim to be constructively discharged where he refuses to comply with the known expectations of his employer." *Id.*

Similarly, in *Agnew v. BASF Corp.*, 286 F.3d 307 (6th Cir. 2002), the plaintiff was placed on a performance plan and argued that termination would have been the inevitable result. The court held that, although termination was a possibility if the plaintiff did not complete the plan, it was a possibility "contingent on future developments, rather than being a present plan or decision." *Id.* at 310. Moreover, "[a]n employer does not constructively discharge an employee simply by advising him that he must be productive in order to retain his new job." *Id.* at 310 (internal quotation omitted). Instead, "[a]n employee who quits a job in apprehension that

18

conditions may deteriorate later is not constructively discharged." *Id. See also Seely v. Runyon*, 1998 U.S. App. Lexis 31311 **5-6 (10th Cir. 1998) (holding that a 90-day retraining program required due to supervisory dissatisfaction with job performance was not constructive discharge) (unpublished; copy attached); *Vannoy v. OCSEA Local 11*, 36 F. Supp. 2d 1018, 1024 (S.D. Ohio 1999) (holding that legitimate options for continued employment precludes a finding of constructive discharge and that "unpleasant exchanges with superiors" and "reprimands for performance and attendance" do not constitute objectively intolerable working conditions sufficient to give rise to constructive discharge); *Leonard v. Gates Rubber Co.*, 2001 U.S. Dist. LEXIS 21377, at **9-10 (W.D. Ky. Dec. 20, 2001) (offering a 90-day period to meet specified performance standards or face termination did constitute constructive discharge) (unpublished; copy attached); *Baer v. Scotts Co.*, 2001 Ohio 3978, 2001 Ohio App. LEXIS 5372, at **21-22 (Ohio Ct. App. Dec. 6, 2001) (same); *Caslin v. General Electric Co.*, 696 F.2d 45, 47 (6th Cir. 1982) ("The fact that plaintiff's supervisor implemented a three-month 'improvement program' when [plaintiff] protested his [performance evaluation] would not support a finding that the employer deliberately made plaintiff's working conditions intolerable."); *McCullough v. St. Francis Hospital & Medical Center, Inc.*, 1987 U.S. Dist. LEXIS 8695, at **25-26 (D. Kan. Sept. 22, 1987) (three-month probationary period for performance evaluation did not constitute constructive discharge; "Although we agree that a reasonable person would find poor evaluations and probation to be disagreeable, we find no evidence that defendant's actions made working conditions intolerable.") (unpublished; copy attached).

Based on the foregoing authority and the undisputed facts, Saville cannot establish that he was constructively discharged when he retired. IBM offered him the alternative of going on a

performance improvement plan to address specific deficiencies in his relations with his peers and customers or retiring with enhanced separation benefits. There is no evidence of intolerable conditions. Saville had a real opportunity to correct his problems, just as other employees had done. Thus, as a clear alternative to resignation, Saville had the choice of remaining employed under the improvement plan.

Because Saville had a reasonable choice other than resignation, his decision to retire was voluntary as a matter of law and not a constructive discharge. Accordingly, his retaliation claim must be dismissed because he cannot establish adverse employment action.[4]

### 3. Saville cannot show a causal connection because Ms. Fullmer, the decisionmaker, never knew of his complaints about alleged illegal overtime practices and, indeed, had initiated the interim negative performance rating *before* he ever complained.

Even assuming for sake of argument that Saville could establish adverse employment action, he cannot demonstrate that it was causally connected to any complaints that he made concerning alleged illegal overtime practices. An employer cannot engage in unlawful retaliation where the person making the alleged adverse employment decision does not know that the employee has opposed or is opposing violation of law. *See Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (holding that "an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing" a violation of law);

---

[4] Saville also contends that Ms. Fullmer engaged in adverse employment action by allegedly "ordering [him] to vacate his desk at the Mountain States Service Center in Salt Lake City" several months prior to his resignation. Complaint ¶ 20. Saville concedes, however, that he retained a home computer terminal, only came to the office once per week, and he was able to continue his work notwithstanding the elimination of his desk. **Ex. A at 464:14-24, 466:11-13 466:25-467:6**. The elimination of Saville's work desk does not amount to unreasonable and intolerable work circumstances and does not establish constructive discharge. *See Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 858-58 (10th Cir. 2000) (no adverse action where plaintiff showed, *inter alia*, that her desk was moved to a different location).

*Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993) (holding no causal connection could be shown where supervisor who made the decision to remove plaintiff was unaware that plaintiff had engaged in protected activity).

Here, Ms. Fullmer was the decisionmaker with respect to the adverse employment action alleged by Saville. She made the decisions first to give him an interim PBC lowering his rating and then to place him on a performance improvement plan. Saville's alleged protected activity was complaining to Ms. Pye and Mr. Myers about alleged violations of overtime law. It is undisputed, however, that Ms. Fullmer was unaware of these complaints until after Saville had retired, and long after she had allegedly taken adverse employment action against him. **Ex. B ¶ 27; Ex. A at 541:5 – 542:12**.

Moreover, the timeline of the alleged adverse employment acts is inconsistent with retaliation for a separate reason. Again, Saville's alleged protected activity was raising what he believed to be illegal overtime practices with Ms. Pye and then with the manager for his region, Brian Myers. He did not voice these concerns until <u>after</u> Ms. Fullmer had already given him an interim PBC, lowering his performance rating, and had counseled him for the very same types of performance problems that resulted in her decision to place him on a performance improvement plan, which Saville asserts was the *coup de grace*. In other words, the protected activity—the alleged retaliatory motive—did not even exist at the time when Ms. Fullmer began the process Saville deems adverse employment action. Indeed, it was the interim PBC that triggered Saville to complain to Ms. Pye and then to Mr. Myers. Accordingly, there can be no inference that Ms. Fullmer acted in retaliation for the complaints raised with Ms. Pye and Mr. Myers. *See Guevara v. Best Western Stevens Inn, Inc.*, 2003 U.S. App. LEXIS 21615, at **5-6 (10th Cir. October 22,

2003) (holding no inference of causal connection where defendant's written warnings to plaintiff about poor performance after protected activity were consistent with warnings given before protected activity) (unpublished; attached); *Ring v. Sears, Roebuck & Co.*, 250 F.Supp. 2d 1130, 1135-1136 (D. Minn. 2003) (holding that where documentation of performance problems precedes alleged protected activity, the inference of retaliation is negated).

In summary, Saville can show neither adverse employment action nor a causal connection between his complaints about alleged illegal overtime practices and the decisions to lower his performance rating and then to place him on a performance improvement plan. Accordingly, he cannot establish a *prima facie* case of FLSA retaliation as a matter of law.

**B.** **Even if he could make out a *prima facie* case, Saville's retaliation claim fails as a matter of law because there is no evidence that IBM's reasons for placing him on a performance improvement plan were pretextual.**

As demonstrated, IBM is entitled to summary judgment because Saville cannot make out a *prima facie* case of retaliation.  But even if he could clear that hurdle, Saville's FLSA retaliation claim must still be dismissed because IBM's had a legitimate nondiscriminatory reason for the alleged adverse employment actions against Saville and there is no evidence of pretext.

**1.** **Ms. Fullmer decided to lower Saville's performance rating on an interim basis and later to place him on a performance improvement for the legitimate nondiscriminatory reason that she was attempting to correct his repeated problems with peer and customer relations and poor attitude.**

Once an employee establishes a *prima facie* case, the burden shifts to the employer to proffer a legitimate non-discriminatory reason for its actions.  *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997).  "The defendant need not prove the absence of retaliatory

motive, but only need produce evidence that would dispel the inference of retaliation by establishing a legitimate reason." *Id.* (quotation omitted).

IBM had a legitimate nondiscriminatory reason for taking the actions that Saville complains were adverse. Specifically, Saville's job required him to interact positively with customers and peers to ensure customer satisfaction and to allow him to mentor the less experienced CEs in his group. Ms. Fullmer was legitimately concerned that Saville was failing in these duties, because of his attitude problems. She received reports from peers and customers that Saville's communication style was preventing peers from seeking mentoring from Saville and was alienating customers, to the point where customers requested that Saville be removed from work on their accounts. Furthermore, Ms. Fullmer believed that Saville was inappropriately challenging her authority in group meetings and denigrating her and other IBM management.

Numerous courts have held that (mis)behavior similar to what Ms. Fullmer experienced with Saville provides legitimate grounds to take adverse action. *See, e.g.*, *Anderson v. Stauffer Chemical Co.*, 965 F.2d 397, 401 (7th Cir. 1992) (holding that legitimate reasons for termination included plaintiff's inability to get along with his subordinates or develop good relationships with customers, and his refusal to admit that there was a problem or take steps to correct it); *Bick v. Harrah's Operating Co.*, 2000 U.S. Dist. LEXIS 1764, at *19 (N.D. Ill. Feb. 16, 2000) (legitimate reasons for termination included "strained relations with her colleagues") (copy attached); *Epstein v. Southern Cal. Permanente Med. Group*, 1998 U.S. App. LEXIS 5537, at *7 (9th Cir. Mar. 19, 1998) (holding that customer complaints regarding employee's attitude and conduct were legitimate nondiscriminatory reasons for termination) (unpublished; copy

attached); *Knezevic v. Hipage Co.*, 981 F. Supp. 393, 395-396 (E.D.N.C. 1997), *aff'd,* 1997 U.S.

App. LEXIS 33097 (4th Cir. 1997) (legitimate nondiscriminatory reasons included employee's

disagreement with manager's directives and customer complaints regarding employee's attitude);

*Martin v. Gingerbread House, Inc.*, 977 F.2d 1405, 1408 (10th Cir. 1992) (denying FLSA

retaliation claim where legitimate reasons for employment action included failure to follow

directions of management); *Galicia v. Postmaster Gen.*, 1993 U.S. App. LEXIS 16222, at **2-5

(9th Cir. June 24, 1993) (affirming dismissal of retaliation claim where employer offered

legitimate nondiscriminatory reasons that employee was "unable to get along with her

supervisors and co-employees, [and] she received many customer complaints.") (unpublished;

attached); *Fry v. Iowa City*, 538 N.W.2d 302, 304 (Ct. App. Iowa 1995) (denying FLSA

retaliation claim where legitimate reasons for employment action included plaintiff's "poor

attitude, borderline insubordination . . . , performance weakness, and problems with work

initiative").

      Accordingly, Ms. Fullmer had legitimate nondiscriminatory reasons for her decisions to

give Saville an interim PBC lowering his performance rating and later to place him on a

performance improvement plan.

      **2.**      **Saville cannot satisfy his burden of proving pretext.**

      Once the employer proffers a legitimate nondiscriminatory reason, the plaintiff has the

burden of presenting direct evidence of retaliatory motive or evidence of pretext.  *Conner*, 121

F.3d at 1396.  "The pertinent inquiry at this stage does not focus on whether the employer's

'proffered reasons were wise, fair or correct,' but looks at whether the employer 'honestly

believed those reasons and acted in good faith on that belief.'"  *Beams v. Norton*, 256 F.Supp. 2d

1203, 1215 (D. Kan. 2003) (quoting *Bullington v. United Airlines*, 186 F.3d 1301, 1318 (10th

Cir. 1999)).

There is no evidence in the record that Ms. Fullmer's stated reasons for her decisions to

lower Saville's performance rating on an interim basis and, when that did not work, to place him

on a performance improvement plan were based on anything other than Saville's repeated failure

to meet his job requirements.  Accordingly, Saville cannot demonstrate pretext and IBM is

entitled to judgment as a matter of law in its favor on his FLSA retaliation claim.

## IV.  CONCLUSION

WHEREFORE, for the foregoing reasons, IBM respectfully requests an Order granting

IBM's Motion for Summary Judgment and entering judgment in favor of IBM on Saville's sole

claim for retaliation under the FLSA.

Respectfully submitted this ___ day of September, 2004.


HOLME ROBERTS & OWEN LLP
Elizabeth T. Dunning (3896)
Martin D. Litt (Pro Hac Vice)
Sven C. Collins (Pro Hac Vice)


_____
299 S. Main Street, Suite 1800
Salt Lake City, Utah 84111-2304
(801) 521-5800

1700 Lincoln, Suite 4100
Denver, Colorado 80203
(303) 861-7000

Attorneys for International Business Machines Corporation

25

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was served by United States first class mail, postage paid, this ___ day of September, 2004, upon the following:

> David J. Holdsworth
> 9125 So. Monroe Plaza Way, Suite C
> Sandy, UT  84070
>
> Facsimile: (801) 567-9960

_____

26

HOLME ROBERTS & OWEN LLP
Elizabeth T. Dunning #3896
Martin D. Litt (Pro Hac Vice)
Sven C. Collins (Pro Hac Vice)
299 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2263
Telephone:    (801) 521-5800
Facsimile:    (801) 521-9639

Attorneys for Defendant International Business Machines Corporation

<table>
<tr><td colspan="2">IN THE UNITED STATES JUDICIAL DISTRICT COURT<br>FOR THE DISTRICT OF UTAH, CENTRAL DIVISION</td></tr>
</table>

| | |
|---|---|
| MICHAEL SAVILLE,<br><br>                        Plaintiff,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES<br>CORPORATION, a New York Corporation,<br><br>                       Defendant. | **REPLY BRIEF IN SUPPORT OF<br>DEFENDANT'S MOTION FOR<br>SUMMARY JUDGMENT**<br><br>Case No. 2:00CV00681B |

International Business Machines Corporation ("IBM"), for its reply in support of IBM's

Motion for Summary Judgment on Michael Saville's ("Saville") sole claim for relief for

retaliation under the Fair Labor Standards Act, 29 U.S.C. § 215 ("FLSA"), states as follows:

## <u>TABLE OF CONTENTS</u>

**Page**

I. INTRODUCTION .................................................................................................... 1

II. REPLY CONCERNING STATEMENT OF UNDISPUTED FACTS ..................................... 1

III. ARGUMENT ...................................................................................................... 7

    A.      Saville cannot make out a *prima facie* case of FLSA retaliation. ......................... 7

        1.      Neither Saville's resistance to Ms. Fullmer's lawful directives to reduce overtime nor his notification that coworkers allegedly were grumbling about working, but not recording, overtime constitutes protected activity. ................................................................................... 7

        2.      Saville has presented no justification why he did not take the reasonable option of attempting to succeed on the performance improvement plan rather than retiring. ......................................................... 9

        3.      Saville has failed to introduce any evidence that the decision maker, Ms. Fullmer, was aware of his complaints about alleged illegal overtime practices or otherwise show a causal connection between his complaints and any alleged adverse actions. ........................ 12

    B.      Saville has shown no evidence of pretext. ........................................................... 14

#1044022 v3

# TABLE OF AUTHORITIES

**Cases**

*Agnew v. BASF Corp.*,
  286 F.3d 307 (6th Cir. 2002) ................................................. 11

*Beams v. Norton*,
  256 F. Supp. 2d 1203 (D. Kan. 2003) .................................... 17

*Bowen v. Fed. Express Corp.*,
  2000 U.S. Dist. LEXIS 1697, at *12-13 (N.D. Tex. Feb. 8, 2000)......... 15

*Conner v. Schnuck Markets, Inc.*,
  121 F.3d 1390 (10th Cir. 1997) ............................................ 14

*Crumpacker v. Kansas Dep't of Human Resources*,
  338 F.3d 1163 (10th Cir. 2003) .............................................. 7

*Faulkner v. Super Valu Stores, Inc.*,
  3 F.3d 1419 (10th Cir. 1993) ............................................... 14

*Forrester v. Roth's I.G.A. Foodliner, Inc.*,
  646 F.2d 413 (9th Cir. 1981) ................................................ 9

*Garner v. Wal-Mart Stores, Inc.*,
  807 F.2d 1536 (11th Cir. 1987) ............................................ 12

*Gust v. Jones*,
  162 F.3d 587 (10th Cir. 1998) ......................................... 2, 3, 5

*Hardie v. Cotter & Co.*,
  849 F.2d 1097 (8th Cir. 1988) ............................................. 14

*Heno v. Sprint/United Mgmt. Co.*,
  208 F.3d 847 (10th Cir. 2000) .......................................... 10, 12

*Kelley v. Airborne Freight Corp.*,
  140 F.3d 335 (1st Cir. 1998)................................................ 14

*Petersen v. Utah Dept's of Corrections*,
  301 F.3d 1182 (10th Cir. 2002) ............................................. 8

*Ramsey v. City & County of Denver*,
  907 F.2d 1004 (10th Cir. 1990) ........................................... 10

*Reich v. Stewart*,
  121 F.3d 400 (8th Cir. 1997) ............................................... 9

*Rice v. United States*,
  166 F.3d 1088 (10th Cir. 1999) ........................................... 14

*Robertson v. Board of County Comm'rs*,
  78 F. Supp. 2d 1142 (D. Colo. 1999)....................................... 9

*Salguero v. City of Clovis*,
  366 F.3d 1168 (10th Cir. 2004) ........................................... 16

*Shorter v. ICG Holdings, Inc.*,
  188 F.3d 1204 (10th Cir. 1999) ........................................... 16

#1044022 v3

*Stover v. Martinez*,
  382 F.3d 1064 (10th Cir. 2004) ................................................ 15
*Tran v. Trustees of the State Colleges in Colo.*,
  355 F.3d 1263 (10th Cir. 2004) ........................................... 10, 15
*Whitaker v. Pacific Enterprises Oil Co.*,
  No. 91-5093, 1992 U.S. App. LEXIS 5135, at *3 (10th Cir. 1992) ......................................... 9
*Woodward v. City of Worland*,
  977 F.2d 1392  (10th Cir. 1992) ...................................... 10, 11

## I.  INTRODUCTION

Saville has failed to carry his burden on every element of his FLSA claim.  His Response brief is fraught with unsupported allegations of fact and misstatements of the pertinent authority governing his claim.  In the end, Saville has no proof that his decision to retire from IBM was anything other than voluntary.  He also has no facts challenging that his manager, Vickie Fullmer, placed him on a performance improvement plan because she honestly believed that he was failing in key responsibilities of maintaining positive relations with his peers and IBM customers.  Moreover, there is no evidence that Ms. Fullmer's decision to place Saville on a performance improvement plan was in any way causally connected with complaints he made to higher management and to human resources that coworkers were grumbling about but not reporting overtime they had worked.  Thus, IBM's summary judgment motion should be granted.

## II.  REPLY CONCERNING STATEMENT OF UNDISPUTED FACTS

IBM identifies below the facts that Saville agrees are undisputed and demonstrates that the factual disputes that he contends exist are either immaterial or unsupported by the record.

1-6.    Saville agrees there is no dispute.

7, 8.    It remains undisputed that Saville's performance evaluations, as early as 1995, raised concerns that his negative style of interaction with his peers alienated them, that his manager continued to note these problems in his 1996 performance, and that at least two of Saville's peers had chosen not to work with him.

9.    Saville agrees there is no dispute.

10, 11. It remains undisputed that, when Ms. Fullmer took over, she had the impression that Saville had problems with his interpersonal relations and that, during her first year

supervising him, these impressions were confirmed as several of Saville's co-workers complained to her that they were uncomfortable asking him for technical assistance because he would often handle the situation in a demoralizing manner and he would talk down to them. Ms. Fullmer's testimony about these complaints is properly based on her perception.  *See, e.g., Gust v. Jones*, 162 F.3d 587, 595 (10th Cir. 1998) ("Rule 701 allows a lay witness to give an opinion that is rationally based on his own perception if that opinion is helpful to a clear understanding of a fact at issue.").  Moreover, the complaints are not hearsay because they are being introduced to show that they were made and to show Ms. Fullmer's state of mind, rather than for the truth of the matter asserted.  ***See Section III. B, p. 15, infra***.

12.     It remains undisputed that Ms. Fullmer started trying to work with Saville regarding his peers' complaints and his interactions with others in 1997.  Although Saville contends the meeting took place in July 1998, he has no support for this.  The testimony he cites (pages 413 and 414 of his deposition) relates to a subsequent meeting in July 1998, during which Ms. Fullmer was yet again addressing similar issues regarding his poor interaction skills.  *See* **Ex. B**, **¶¶ 18, 19**.[1]  He has presented no facts to contradict Ms. Fullmer's affidavit that she first met with and emailed him on these issues in 1997.

13.     It remains undisputed that Saville's peers commented negatively on his interactions with them and with customers.  Moreover, these comments are entirely consistent with the complaints Ms. Fullmer received from Orem City and the Weider Foods where these

---

[1]     Exhibits A through Q are attached to IBM's Memorandum in Support Motion for Summary Judgment.  Exhibits R and S are attached hereto.

2

customers asked that Saville be removed from their accounts. *See **infra**, ¶¶ **17, 29***. Finally, Saville has introduced no facts contradicting that the negative comments came from his peers.

14.     It remains undisputed that Saville was "cranky" in dealings with his peers and was on notice that he needed to work on his personal relationship skills.

15.     Undisputed. Although Saville contends Ms. Fullmer's opinion lacks specifics, the specifics are set forth in the subsequent fact paragraphs of her affidavit.

16.     Saville presents no facts to contradict that his attitude soured or that he would make negative comments about IBM and his department during meetings. Ms. Fullmer is not required to provide specific examples in order for her testimony on point to have foundation. *See, e.g., Gust v. Jones*, 162 F.3d 587, 595 (10th Cir. 1998).

17.     Notwithstanding Saville's attempt to blame the customer, it remains undisputed that Orem City complained to Ms. Fullmer that Saville would belittle its system operators and programmers and requested that Saville be removed from its account. Ms. Fullmer's testimony is properly founded on her sensory perception of what she heard. Orem City's complaints are not hearsay as they are introduced for the fact that they were made and to show Ms. Fullmer's motive. *See **Section III. B, p. 15, infra***.

18.     Because Saville submits no facts to the contrary, it is undisputed that his peers continued to complain to Ms. Fullmer that they found him difficult to work with and unapproachable because he made them feel stupid, that he had a negative attitude, and that he did not display leadership.

19, 20. It is undisputed that Ms. Fullmer believed Saville's performance was headed in the wrong direction and she, therefore, decided to give him an interim performance review. It is

3

also undisputed that she told him his performance rating was being lowered on an interim basis because, in her assessment, he had a negative attitude, lacked leadership (even though he was being paid as a leader), continued having problems dealing with his peers and customers, and failed to show adequate support for her.

21.     Undisputed.  Saville's opinion that Ms. Fullmer gave him the interim PBC in reaction to a negative opinion survey about her management is irrelevant.  Also, if this were her motivation, it undercuts any notion that it was in retaliation for any alleged overtime complaints.

22, 23. Undisputed.

24.     Saville never pointed out to Ms. Pye or Mr. Myers any specific examples of his peers working but not recording overtime.  **Saville Dep., attached as Ex. R, 447:23 – 448:1, 510:20 – 511:5**.  Moreover, although he contends that a fellow CE, Murray Greaves, said that Ms. Fullmer suggested that Mr. Greaves should not record certain time that might arguably be overtime, *id.* **197:14 – 198:1**, Saville has no evidence that he complained about this to Ms. Fullmer or mentioned this detail to Mr. Myers or Ms. Pye.

25.     None of the purported facts presented by Saville contradict Mr. Myers' testimony that he did not know about the Speak Up with Pat Pye.  *See* **Ex. C ¶ 4.**  Indeed, Saville admitted that he did not think that Mr. Myers knew about the Speak Up.  **Ex. R 475:6-10**.  Saville never gave Mr. Myers or Ms. Pye specific examples of CEs working but not reporting overtime. **Ex. R, 447:23 – 448:1, 510:20 – 511:5**.  Saville's contention that he did not admit being taken off Orem City's account at the customer's behest is misleading.  Saville merely attempted to blame his removal on the customer.  *See* **Ex. R 492:5 – 493:1**; **Ex. M at p. 407**.

26.     Undisputed.

4

27.     It remains undisputed that Mr. Myers interviewed three of Saville's peers and concluded Saville had serious communication problems with Ms. Fullmer and CEs.  It is Saville's burden to show that Mr. Myers' conclusions were invalid.  Saville has presented no facts to contest that the conclusion reached by Mr. Myers was reasonable and in good faith.

28.     As Saville presents no counter evidence, it remains undisputed that he interrupted Ms. Fullmer in a meeting and made several comments that she perceived as undermining her authority and denigrating IBM.  Ms. Fullmer's testimony on these points is based on her attendance at these meetings and her rational perceptions and is, therefore, admissible.  *See, e.g., Gust*, 162 F.3d at 595.

29.     Ms. Fullmer's testimony that another customer complained about Saville and asked that he be replaced is undisputed and is not hearsay.  *See **Section III. B, p. 15, infra***.

30-32.  Undisputed.

33.     Saville's dispute with this paragraph is solely semantic.  It is undisputed that Saville blamed his attitude on how he felt he had been treated by management.

34.     IBM's facts are undisputed.  Although IBM disputes that Mr. Myers told Saville that he "wanted [him] out of IBM," that comment is immaterial.  Saville admits that Mr. Myers told him that he had the option of going on a performance improvement plan. **Ex. R 583:1-11**.

35.     The facts are undisputed.  Ms. Fullmer did not give Saville a written description of the performance improvement plan because he retired rather than going on the plan.  **Second Fullmer Dec., attached as Ex. S, at ¶ 2**.  Saville admitted that his memory was poor about the specific details of the plan that Ms. Fullmer discussed with him, **Ex. R 589:23 – 590:1, 592:2-6**, but he did recall that she said the performance plan would need to address "performance issues,

5

leadership issues, lack thereof; support of peers in teams, support of management; teamwork; customer satisfaction." *Id.* **601:20-25**.

36.    Undisputed.  Furthermore, as an IBM manager, Saville had placed six different employees on improvement plans, all of whom succeeded.  **Ex. R 622:3-10**.

37.    Undisputed.  Saville requested separation code "8J" from IBM human resources so that he could take advantage of another retirement option.  **Ex. R 624:13 – 625:3; Ex. S ¶ 3**.

38.    The deposition testimony Saville cites (pp. 340, 357 & 358) does not evidence any overtime complaints or contradict his clear testimony that the only complaints he made about overtime were those to Pat Pye and Mr. Myers.  **Ex. R 521:3-14, 523:17 – 524:12**.  Moreover, his suggestion that Ms. Fullmer implied he should work but not record overtime is contradicted by his admission that Ms. Fullmer always told him to record his time as "correctly and as accurately and timely as possible," *id.* **281:2-14**, **Ex. Q**, that he knew he was to report his overtime, *id.* **190:15-22**, and that he was paid for all overtime he worked, *id.* **179:13-15**.

39.    There is no support for Saville's contention that he had email discussions with Ms. Fullmer regarding "IBM limiting the amount of overtime and employees responding by working overtime and not recording it."  Page 275 of his deposition only supports the proposition that he and Ms. Fullmer discussed the overtime directive, but does not reveal any complaints about what he perceived to be violations of the FLSA.  Indeed, Saville admitted that he never told Ms. Fullmer that he thought her emails to him regarding overtime were inappropriate. **Ex. R 359:9-13**.  Further, Saville offers no facts to dispute that Ms. Fullmer was unaware of the overtime issues that he raised with Ms. Pye or Mr. Myers; it is thus undisputed that Ms. Fullmer had no knowledge of such conversations.

6

40.     Again, Saville mis-cites page 275 of his deposition for the proposition that he had e-mail discussions with Ms. Fullmer regarding "IBM limiting the amount of overtime and employees responding by working overtime and not recording it."  He has no evidence of such emails.  He also has presented no evidence to rebut Ms. Fullmer's testimony that the sole reason she gave him an interim PBC and later decided to place him on a performance improvement was because of his repeated failure to meet his job requirements.

## III.  ARGUMENT

**A.     Saville cannot make out a *prima facie* case of FLSA retaliation.**

> **1.     Neither Saville's resistance to Ms. Fullmer's lawful directives to reduce overtime nor his notification that coworkers allegedly were grumbling about working, but not recording, overtime constitutes protected activity.**

Saville has not shown that he complained about any actions of IBM that he could reasonably, and in good faith, have interpreted as illegal under the FLSA.  *See Crumpacker v. Kansas Dep't of Human Resources*, 338 F.3d 1163, 1171 (10th Cir. 2003) (holding that a plaintiff may not maintain a retaliation claim based on an unreasonable belief that the underlying conduct violates the law).  First, he apparently concedes that his pushback to Ms. Fullmer's admittedly lawful instructions that he needed to control the amount of overtime he worked did not constitute complaints about perceived overtime violations.  *See Response* at 23.  His attempts to justify why he should have been allowed to work more overtime, in spite of IBM's lawful directive, did not constitute protected activity.

The only other alleged protected activity that he points to was when he allegedly mentioned to Mr. Myers and Pat Pye that his peers were grumbling about working but not recording overtime.  *See Response* at 23-24; *Memo In Support of Motion for Summary Judgment*

at p. 13 ¶ 38.[2]  As such, Saville's complaints to Ms. Pye and Mr. Myers were not specifically complaints about FLSA violations.  In *Petersen v. Utah Dept's of Corrections,* 301 F.3d 1182, 1188 (10th Cir. 2002), the Tenth Circuit rejected a claim of Title VII retaliation for this very reason.  There, the plaintiff complained that her supervisor was acting unfairly with respect to a performance review of the plaintiff's subordinate.  *Id.* at 1185-1186.  Although the plaintiff had heard her supervisor make racist comments about the subordinate, and believed he was acting because of racial animus, she did not make this clear when she complained.  *Id.*  When the plaintiff was later transferred after her supervisor found out about her complaint, she contended that it was retaliation in violation of Title VII.  The court disagreed.

The court held that the plaintiff's Title VII retaliation claim could not be maintained unless her supervisor knew she was complaining about acts she believed to be unlawful under Title VII.  *Id.* at 1188.  Because the plaintiff only complained about her supervisor's treatment of her co-worker in general terms, and not in terms of racial discrimination, her "superiors could not know that she was engaging in protected opposition . . . .  If, for all they knew, [the plaintiff] was opposing [her supervisor's] treatment of [her co-worker] because the treatment violated established practices and was unfair . . . they would not know [she] was 'opposing a practice made an unlawful employment practice by Title VII.'"  *Id.*

Similar to the plaintiff's complaints in *Petersen,* Saville did not specifically complain about violations of the FLSA.  He merely pointed out to Mr. Myers and Ms. Pye that his peers were working, but not recording, overtime.  This could only constitute a report about a FSLA

---

[2]  Saville also claims that he "began raising concerns" and "was complaining" about various overtime matters, citing his deposition at 122 and 202-204.  This testimony does not, however, demonstrate any "raising [of] concerns" or "complaining."

violation if Saville had also complained, reasonably and in good faith, that IBM was aware of these alleged activities but was turning a blind eye. *See Whitaker v. Pacific Enterprises Oil Co.*, No. 91-5093, 1992 U.S. App. LEXIS 5135, at *3 (10th Cir. 1992) (affirming summary judgment in favor of employer on FLSA claim, because plaintiff failed to prove that employer knew or should have known of plaintiff's overtime work) (unpublished; copy attached); *see also Robertson v. Board of County Comm'rs,* 78 F. Supp. 2d 1142, 1160 (D. Colo. 1999) (holding that "where the acts of an employee prevent an employer from acquiring knowledge . . . of alleged uncompensated overtime hours, the employer cannot be said to have suffered or permitted the employee to work in violation" of the FLSA); *Reich v. Stewart*, 121 F.3d 400, 407 (8th Cir. 1997) (holding that employer does not violate the FLSA where employees are self-under-reporting overtime unless employer has knowledge of same); *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981) (holding that "where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer . . . the employer's failure to pay for the overtime hours is not a violation of § 207"). Saville has no evidence that he complained that IBM was turning a blind eye to the alleged impact that the overtime policy was having on employee overtime reporting. Because his complaints to Ms. Pye and Mr. Myers about employee grumbling did not put them on notice that he was raising complaints about FLSA violations, they did not constitute protected activity.

>   **2.    Saville has presented no justification why he did not take the reasonable option of attempting to succeed on the performance improvement plan rather than retiring.**

Saville contends that IBM has misstated his burden of proving constructive discharge. He is mistaken.  As the Tenth Circuit holds, Saville must prove that IBM "by its illegal

9

discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Ramsey v. City & County of Denver*, 907 F.2d 1004, 1010 (10th Cir. 1990) (quotation omitted); *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 858 (10th Cir. 2000). "[A] constructive discharge requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but intolerable." *Tran v. Trustees of the State Colleges in Colo.*, 355 F.3d 1263, 1271 (10th Cir. 2004). Put another way, "constructive discharge occurs when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit." *Woodward v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir. 1992).

Saville is equally mistaken that he can prove constructive discharge merely by showing that it was "in [his] best interest to resign." *Response* at p. 27. This diluted standard is not supported by any authority and is directly contrary to the above-cited Tenth Circuit cases.

Saville argues that the performance review plan that Ms. Fullmer offered him was somehow a sham because it was only 30 days and he had not received written specifics regarding its terms. Neither of those aspects of the plan excuses his failure to accept it as an alternative to resignation.

First, the only reason Ms. Fullmer did not give Saville a written description of the performance improvement plan was because she was waiting to see if he would take that option before drafting the plan, and he retired rather than accepting the plan. *See Section II, ¶ 35, supra.* Moreover, Saville admitted that Ms. Fullmer told him the performance plan would address "leadership issues, lack thereof; support of peers in teams, support of management; teamwork; customer satisfaction." *Id.* Thus, Saville knew where IBM expected to see

10

improvement in his performance.  *See Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) (holding that plan that required employee to complete plan "with an acceptable level of performance" was reasonable alternative to resignation).

Second, Saville has no authority for his contention that giving an employee 30 days, as opposed to 90 days, to correct performance is insufficient as a matter of law and constitutes constructive discharge.  None of the cases cited in IBM's opening brief holds that improvement plans are required to be at least 90 days.[3]  Indeed, beyond his speculation, Saville has presented no evidence explaining why he would not have been able to improve in the areas outlined by Ms. Fullmer in a 30-day timeframe.

Nor does Mr. Myers' alleged comment that he "want[ed] Saville out of IBM" transform the offer of a performance improvement plan into a constructive discharge.  Even assuming this comment was made, which IBM does not contest here, Saville admits he understood that he had the option of going on a performance improvement plan.  *See Section II, ¶ 35, supra.*  Moreover, Saville remained employed for a full month after this alleged comment by Mr. Myers, during which time Saville was exploring his options.  Thus, Saville cannot now claim that he thought the alleged comment by Mr. Myers was tantamount to being fired.

Again, Saville must show that the circumstances of his employment were intolerable such that he had no reasonable option but to quit.  *Woodward v. City of Worland*, 977 F.2d at 1401.

---

[3]     *See Agnew v. BASF Corp.*, 286 F.3d at 310 (duration of the plan was not material to court's holding); *Hillman v. Safeco Ins. Co.*, 190 F. Supp. 2d 1029 (N.D. Ohio 2002) (making no mention of the duration of the plan in its holding); *Seely v. Runyon*, 1998 U.S. App. LEXIS 31311, at * 8 (10th Cir. Dec. 14, 1998) (same); *Peecook v. Northwestern Nat'l Ins. Group*, 1998 U.S. App. LEXIS 18265, at * 11-13 (6th Cir. Aug. 3, 1998) (same); *Caslin v. General Elec. Corp.*, 696 F.2d 45, 47 (6th Cir. 1982) (same); *Leonard v. Gates Rubber Co.*, 2001 U.S. Dist. LEXIS 21377, at *10-11 (W.D. Ky. 2001) (same).

He has not explained why he could not have simply accepted the performance improvement plan and attempted to succeed under it for 30 days. He has likewise not explained why he could not have performed his duties without generating customer or peer complaints for 30 days. His speculation that he would have necessarily failed to improve under the plan does not carry his burden of proving constructive discharge. *See Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987) (holding "[p]art of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast."). Accordingly, he cannot establish constructive discharge.[4]

> **3.    Saville has failed to introduce any evidence that the decision maker, Ms. Fullmer, was aware of his complaints about alleged illegal overtime practices or otherwise show a causal connection between his complaints and any alleged adverse actions.**

Saville speculates that Ms. Fullmer could have been "working off the same script" as Mr. Myers and Ms. Pye. Saville, however, presents no evidence to contradict IBM's evidence that Ms. Fullmer solely made the decisions to give him an interim PBC lowering his rating and then to place him on a performance improvement plan. *See Section II, ¶¶ 19,30, supra.*

Saville concedes that his discussions with Ms. Fullmer about IBM's overtime policy "may not have risen to the level of a 'complaint' until after his 'speak up.'" *Response* at 35. This concession is unsurprising, given that Saville introduced no evidence that he made <u>any</u> complaints about alleged illegal overtime practices to Ms. Fullmer either before or after the Speak Up. His statement that Ms. Fullmer "knew about his concerns of how IBM's practices

---

[4]    Saville also makes passing reference to the fact that Ms. Fullmer took away his desk at the office; this is not adverse employment action. *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 858-59 (10th Cir. 2000).

were requiring creative evasion on the part of his peers," *Response,* at 35, is unsupported by any citation to evidence.  Accordingly, there is no evidence that Saville made any overtime complaints directly to Ms. Fullmer.

Additionally, Saville has presented no evidence that Ms. Fullmer learned about his complaints to Ms. Pye and Mr. Myers.  Although Saville speculates that Mr. Myers or Ms. Pye may have told Ms. Fullmer about the complaints, the record is devoid of any evidence to contradict Ms. Fullmer's testimony that she did not learn of these complaints until long after she had already decided to place him on a performance improvement plan.  *See Section II, ¶ 27, supra.*  It is undisputed that Ms. Fullmer was unaware of these complaints until after Saville had retired.  **Ex. B ¶ 27; Ex. R 541:5 – 542:12**.

Moreover, Saville has not addressed the fact that Ms. Fullmer gave him his interim PBC before he ever suggested to Ms. Pye or Mr. Myers that his peers were grumbling about overtime.  Given this fact, Ms. Fullmer could not have been reacting to his alleged complaints.

Finally, the Court should disregard Saville's speculation on pages 36-38 of his Response that Ms. Fullmer was acting in concert with Ms. Pye and Mr. Myers.  None of Saville's contentions in those pages—regarding alleged overtime complaints he made to Ms. Fullmer, regarding Mr. Myers allegedly notifying Ms. Fullmer of overtime complaints, or regarding Ms. Fullmer's alleged dealings with Mr. Myers—are supported by any citation to the record.  These contentions are all based on "mere speculation, conjecture, or surmise," unsupported by

13

evidence, which is insufficient to resist summary judgment.  *See, e.g., Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999).[5]  Thus, Saville has not demonstrated a causal connection.

**B.      Saville has shown no evidence of pretext.**

Saville mistakenly contends that IBM must prove its case of Ms. Saville having a negative attitude and problems with peers and customers.  To the contrary, IBM's burden is just to proffer a facially legitimate non-discriminatory reason for its actions.  *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997).  This is not a high burden and only requires IBM to produce some evidence "that would dispel the inference of retaliation by establishing the existence of legitimate reason."  *Id.* (quotation omitted).

To meet its burden, IBM does not have to introduce affidavits from peers or customers, as Saville asserts.  Ms. Fullmer's testimony concerning the complaints is proper evidence.  The complaints are not introduced as substantive evidence, but to explain Ms. Fullmer's state of mind when she made the alleged adverse decisions regarding Saville, which is "a factor of crucial importance in wrongful discharge cases."  *Hardie v. Cotter & Co.*, 849 F.2d 1097, 1101 (8th Cir. 1988).  Thus, the complaints are not hearsay and are fully admissible to explain IBM's legitimate non-discriminatory reasons for placing Saville on the improvement plan.  *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434 (10th Cir. 1993); *see also Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 346 (1st Cir. 1998) ("[A] customer complaint offered to show, for example, that a decision maker had notice of the complaint, rather than to prove the specific misconduct alleged

---

[5]      Without any analysis or discussion, Saville refers to pages 568 – 570 of his deposition as purportedly evidencing a chain of events that allegedly show adverse employment action. Those petty grievances, some as trivial as being instructed not to make copies at Kinkos, do not individually or collectively amount to adverse employment action or constructive discharge.

14

in the complaint, is not barred by the hearsay rule."); *Bowen v. Fed. Express Corp.*, 2000 U.S. Dist. LEXIS 1697, at *12-13 (N.D. Tex. Feb. 8, 2000) (rejecting plaintiff's argument that complaints offered as legitimate non-discriminatory reason were inadmissible hearsay in Title VII case) (unpublished; copy attached).

It is undisputed that Saville's job required him to interact positively with customers and peers.  It is also undisputed that Ms. Fullmer was legitimately concerned that Saville was failing in these duties, because of his attitude problems, and was inappropriately challenging her authority in group meetings.  Therefore, IBM has satisfied its burden of demonstrating legitimate nondiscriminatory reasons for taking the actions that Saville complains were adverse.

The burden thus shifts to Saville to demonstrate pretext, which he has failed to do.  In evaluating pretext, "the 'relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs."  *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004).  The court's role is never to "second guess an employer's business judgment."  *Id.*  "'The pertinent question in determining pretext is not whether the employer was right to think the employee engaged in misconduct, but whether that belief was genuine or pretextual.'"  *Tran v. Trustees of the State Colleges in Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004).

Saville first contends that his negative attitude was just a product of Ms. Fullmer's misperception of his "articulate and forceful" sharing of his concerns.  *Response*, at 40.  However, "it is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of [his] own relative performance."  *Shorter v. ICG Holdings,*

15

*Inc.*, 188 F.3d 1204, 1209 (10th Cir. 1999). Saville has no evidence to show that Ms. Fullmer did not honestly and in good faith perceive Saville's performance as needing improvement.

Saville next attempts to explain away the problems that he had interacting with peers on how IBM structured his job. *Response*, at 41. The facts, however, must be examined "as they appear to the person making the [employment] decision." *Salguero v. City of Clovis*, 366 F.3d 1168, 1176 (10th Cir. 2004). Saville has offered no facts casting doubt on Ms. Fullmer's assessment that the complaints from Saville's peers reflected real concerns with his peer interaction that needed to be addressed. Indeed, Saville admits that it is appropriate to evaluate employees on the basis of attitude towards their job, customers and coworkers. **Ex. R, 610:20 – 611:13.**

Likewise, Saville's attempt to blame the customer complaints on the customers themselves and on Ms. Fullmer's alleged misinterpretation of those complaints does not show pretext. *Response*, at 42. Again, he has no evidence to contradict Ms. Fullmer's testimony that she honestly believed Saville was failing in his customer relations when first the City of Orem and then Weider Foods asked that he be removed from their accounts. Saville is merely attempting to substitute his own subjective evaluation of his performance for Ms. Fullmer's perception. *See also* **Ex. R 531:6-25, 533:14-25, 535:9-17** (admitting that Saville has no foundation for his beliefs regarding reasons for removal from Weider Foods). As there are no facts calling into question that Ms. Fullmer, due to the complaints she received, honestly and in good faith believed that Saville was creating problems with customers, he has not shown pretext.

In the end, Saville has nothing more than "conjecture that [IBM's] explanation is a pretext , [which] is an insufficient basis for denial of summary judgment." *Beams v. Norton*, 256

16

F. Supp. 2d 1203, 1215 (D. Kan. 2003). Accordingly, IBM is entitled to judgment as a matter of

law in its favor on his FLSA retaliation claim.

      Respectfully submitted this ___ day of November, 2004.

                 HOLME ROBERTS & OWEN LLP
                 Elizabeth T. Dunning (3896)
                 Martin D. Litt (Pro Hac Vice)
                 Sven C. Collins (Pro Hac Vice)


                 _____
                 299 S. Main Street, Suite 1800
                 Salt Lake City, Utah 84111-2304
                 (801) 521-5800

                 Attorneys for International Business Machines Corporation

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT was served by United States first class mail, postage paid, this ___ day of November 2004, upon the following:

> David J. Holdsworth
> 9125 So. Monroe Plaza Way, Suite C
> Sandy, UT  84070

_____

HOLME ROBERTS & OWEN LLP
Elizabeth T. Dunning #3896
Martin D. Litt (Pro Hac Vice)
Sven C. Collins (Pro Hac Vice)
299 South Main Street, Suite 1800
Salt Lake City, Utah  84111-2263
Telephone:   (801) 521-5800
Facsimile:    (801) 521-9639
Attorneys for Defendant International Business Machines Corporation

IN THE UNITED STATES JUDICIAL DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MICHAEL SAVILLE,<br><br>                              Plaintiff,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES<br>CORPORATION, a New York Corporation,<br><br>                         Defendant. | **DEFENDANT'S ERRATA SHEET**<br><br>Case No. 2:00CV00681B |

Defendant, International Business Machines Corporation, by and through its counsel,

respectfully submits this errata sheet in order to inform the Court (and counsel for the plaintiff)

that Defendant's Memorandum in Support of Motion for Summary Judgment and Defendant's

Reply Brief In Support of Motion for Summary Judgment, filed on September 7, 2004, and

November 4, 2004, respectively, contain the following inaccuracies with respect to the lines of

the record cited:

Opening Memorandum

- In the seventh line of paragraph 35 on page 13, the citation should be to **Ex. A at 601:7-
  10**, not to 601:11-40.

- In the third line of paragraph 38 on page 13, the citation should be to **Ex. A at 521:3-20,**
  not to 521:3-14.  Moreover, as the cited testimony reflects, Mr. Saville contends that he

1

complained twice to Pat Pye about overtime issues, the first time during his July 1998 Speak Up and the second during a follow-up phone call with Ms. Pye in August 1998.

- The last sentence of page 15, which carries over onto page 16, incorrectly states that the overtime target limit was 10 hours per month, when in fact it was 10 percent overtime, as the cited deposition pages reflect.

Reply Brief

- In the third line of paragraph 38 on page 6, the citation should be to **Ex. A at 521:3-20,** not to 521:3-14.

Respectfully submitted this 17th day of November, 2004.

HOLME ROBERTS & OWEN LLP
Elizabeth T. Dunning (3896)
Martin D. Litt (Pro Hac Vice)
Sven C. Collins (Pro Hac Vice)

_____

299 S. Main Street, Suite 1800
Salt Lake City, Utah 84111-2304
(801) 521-5800

1700 Lincoln, Suite 4100
Denver, Colorado 80203
(303) 861-7000

*Attorneys for International Business
Machines Corporation*

#1046976 v1

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing **DEFENDANT'S ERRATA SHEET** was served via United States first class mail, postage paid, this _____ day of November, 2004, upon the following:

David J. Holdsworth
9125 So. Monroe Plaza Way, Suite C
Sandy, UT  84070

_____

3